# STATE OF CONNECTICUT *v.* DWAYNE ANDREWS
## (SC 15551)

Callahan, C. J., and Katz, Palmer, McDonald and Peters, Js.

Argued October 29, 1998—officially released March 9, 1999

1

*Donald Dakers*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Gary Nicholson*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury convicted the defendant, Dwayne Andrews, as an accessory for aiding and abetting a murder in violation of General Statutes §§ 53a-54a (a)[1] and 53a-8.[2] The trial court rendered judgment in accordance with the jury verdict,[3] from which the defendant appealed to this court.[4] The principal issue on appeal

---

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-8 provides in relevant part: "Criminal liability for acts of another. (a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

[3] The defendant also was charged with conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a). The jury, however, could not agree on a verdict as to the conspiracy count and, consequently, the trial court declared a mistrial as to that count.

[4] The defendant appealed directly to this court pursuant to General Statutes (Rev. to 1995) § 51-199 (b), which provides in relevant part: "The

is whether the trial court improperly prohibited the defendant from cross-examining the state's key witness, Richard Dawkins, regarding possible undue pressure arising out of the trial court's admonishment to Dawkins that he could not avoid giving further testimony without facing incarceration. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At all times relevant to this appeal, the defendant, a New Haven resident, worked for his brother, Edward Andrews, supervising Edward's marijuana distribution business. The defendant's responsibilities included collecting money generated by the organization's marijuana sales. Gerald Royal also distributed marijuana for Edward Andrews, as did another individual, identified only as "Butchie," who worked closely with Royal. Butchie owed Edward Andrews approximately $900, but because Butchie was incarcerated, the defendant had tried on several occasions to collect the debt from Royal. The defendant, however, was unsuccessful, and had become "fed up" with Royal as a result.

On the evening of July 19, 1993, the defendant and another individual visited the defendant's cousin, Thad Stanley, at his place of employment. At that time, the defendant told Stanley that he was going to visit Royal again to attempt to collect the $900.

At approximately 10:20 p.m. that night, Royal was drinking with several friends, including Dawkins, on the porch of 17 Hurlburt Street in New Haven. Two African-American males, both of whom had hoods over their heads, approached the porch. One was dressed

following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

in black and the other wore a camouflage jacket. The man in black purchased two "nickel bags"[5] of marijuana from Royal for $10. He then asked Royal for five more bags of marijuana at a price of $20. Royal, however, refused to sell him the additional marijuana at that price. The man in black, who was armed with a handgun, then shot Royal once in the back as Royal attempted to run inside the house.

Immediately thereafter, the man wearing the camouflage jacket pulled out a gun and held it to Dawkins' head. The man then told Dawkins to "run it," a street term meaning that Dawkins was to empty his pockets. Dawkins, however, had nothing in his pockets. The man in black, who had run across the street, called to the man wearing the camouflage jacket, telling him to "let [it] go," whereupon the man in the camouflage jacket fled with the man dressed in black. Thereafter, Dawkins found Royal in the house, lying on his back, unable to speak and short of breath. Dawkins called an ambulance, which transported Royal to the hospital. Shortly thereafter, however, Royal died from injuries sustained as a result of the gunshot wound to his back.

When the police arrived, Dawkins described the two men and their attire. Dawkins then accompanied the police to the station house, where he gave the police a tape-recorded statement regarding the incident. Dawkins indicated that he did not know either of the two men.

On July 26, 1993, Dawkins returned to the police station and was shown a single photograph of eight African-American males and an enlargement of a portion of that same photograph. The defendant appeared in both the photograph and the enlargement. Dawkins identified the defendant as the man who had put a gun to his head on the evening of July 19. On July 28, 1993,

---

[5] A "nickel bag" is street jargon for $5 worth of marijuana.

the police showed Dawkins a different array of individual photographs depicting eight different African-American males, including the defendant. Dawkins again identified the defendant as the person in the camouflage jacket who had put a gun to his head on July 19, and gave the police a tape-recorded statement to that effect. Additional facts will be provided as necessary.

On appeal, the defendant claims that: (1) the trial court violated his rights under the confrontation clause of the sixth amendment to the United States constitution[6] by precluding him from cross-examining Dawkins regarding the fact that Dawkins had agreed to resume his testimony only after the court had warned Dawkins that he would be incarcerated if he failed to do so; and (2) we should invoke our supervisory authority over the administration of justice to grant him a new trial due to certain allegedly improper comments made by the prosecutor during his closing argument to the jury. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

I

The defendant's primary claim is that the trial court violated his confrontation clause rights under the United States constitution by barring certain cross-examination of Dawkins, the state's key witness. We disagree.

The following additional facts are necessary to our resolution of this issue. In February, 1996, the defendant and Dawkins, who has an extensive criminal record, were incarcerated in the same cellblock at the New Haven Correctional Center (correctional center). On February 10, an inmate approached Dawkins and asked

---

[6] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The defendant has not raised a claim under the Connecticut constitution.

him for a written statement exonerating the defendant in connection with the events of July 19, 1993. Dawkins agreed, and prepared a handwritten statement that differed from his previous statements to the police in two important respects: First, he indicated that the defendant was not the individual in the camouflage jacket who had held a gun to his head on the night of Royal's murder, and second, that he was intoxicated that night. Dawkins gave his handwritten statement directly to the defendant. Later, on June 13, 1996, after Dawkins had been released from jail, an investigator working on the defendant's behalf visited Dawkins and took a signed, sworn statement from him that was identical in all material respects to the one that he previously had given to the defendant in jail.

At trial, the state elicited Dawkins' testimony regarding his version of the events taking place on the evening of July 19, 1993, including his contradictory statements about the defendant's culpability. In attempting to explain those statements, Dawkins' testimony was confusing and, at times, inconsistent.[7]

---

[7] For example, Dawkins initially indicated that he was not certain whether the person he had identified in the photographs was the person wearing the camouflage jacket who had held a gun to his head on July 19, 1993. However, when Dawkins reviewed a copy of the statement that he had given to the police within two weeks of the murder, he admitted that, at the time he selected the defendant's photograph, he had no doubt that the person he had identified was the man who had accosted him on July 19.

As to why he had agreed to prepare a statement exonerating the defendant when the two men were incarcerated together at the correctional center, Dawkins first indicated that the inmate who requested the statement had directed Dawkins to do so. Later, Dawkins testified that he had drafted the statement "[b]ecause I felt that [the defendant] wasn't the guy, [that he] wasn't involved in that hold-up." Immediately thereafter, however, Dawkins again indicated that he had felt pressured to compose the exculpatory statement.

Finally, on the issue of his drinking on the night of the murder, Dawkins acknowledged that, in the statement he had delivered to the defendant in jail, he claimed that he had been intoxicated. Dawkins then testified that he had been somewhat intoxicated, but not drunk. When questioned further

Before the conclusion of his testimony on direct examination, Dawkins, out of the presence of the jury, stated that he no longer wanted to testify and that he wished to speak to an attorney.[8] The trial court informed Dawkins that he was required to testify and, further, denied Dawkins' request for an attorney.[9] Dawkins then sought to assert his privilege against self-incrimination guaranteed by the fifth amendment to the United States constitution.[10] The trial court, however, ruled that, in light of Dawkins' testimony up to that point, there was no legitimate basis for his invocation of the privilege.[11] The defendant then inquired as to whether he would receive jail time if he refused to testify. The court confirmed that Dawkins would be incarcerated if he persisted in his refusal to provide testimony and, furthermore, that the amount of time that would be imposed for his refusal to testify depended upon how many questions Dawkins refused to answer.[12] The trial

by the state, Dawkins explained that "[i]ntoxicated and drinking is the same thing."

[8] Dawkins announced his unwillingness to continue testifying after the lunch recess on the first day of his testimony.

[9] The record contains no indication, and the defendant does not claim, that Dawkins was represented by counsel, or improperly denied the representation of counsel, in connection with his testimony in this case.

[10] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."

[11] The defendant made no claim that the trial court had improperly rejected Dawkins' assertion of his constitutional privilege against self-incrimination.

[12] The relevant portion of the colloquy between the trial court and Dawkins is as follows:

"[Mr. Dawkins]: It's jeopardizing a man's life over there. I'm testifying against him.

"The Court: But that's not a fifth amendment reason not to testify.

"[Mr. Dawkins]: If I don't say nothing, you're going to lock me up?

"The Court: Yes.

"[Mr. Dawkins]: For how long?

"The Court: Well, it depends on how many questions are asked and how many questions you refuse to answer.

"[Mr. Dawkins]: So I get a year for each question?

court then took a brief recess so that Dawkins could decide how he wished to proceed. At the conclusion of the recess, Dawkins informed the court that he was willing to resume testifying.

The jury was recalled, and the prosecutor proceeded with his direct examination of Dawkins. During the course of his testimony, Dawkins positively identified the defendant as the person in the camouflage jacket who had held a gun to his head on the night of Royal's murder.

On cross-examination, the defendant highlighted the fact that Dawkins had given two statements, one on February 10, 1996, and another on June 13, 1996, stating "unequivocally" that the defendant was not the man who had held a gun to his head on July 19, 1993. The defendant also elicited testimony from Dawkins that, at that time, there were several charges pending against him, including assault, violation of probation[13] and violation of a protective order. The defendant then asked Dawkins whether he previously had indicated to the court that he wished to assert his fifth amendment privilege and refrain from testifying any further. The state objected to the defendant's question and the trial court sustained the objection. Thereafter, the defendant asked Dawkins if he had been threatened with contempt if he failed to testify. The trial court sustained the state's objection to that question as well. The defendant, however, was permitted to ask Dawkins why he had informed the court, outside the jury's presence, that he did not wish to provide any additional testimony. Dawkins responded: "I just didn't want to testify no more." When pressed further about why he did not

"The Court: You may well get a substantial amount of time for each question. So you're going to have to decide whether or not you're going to answer questions . . . ."

[13] Dawkins indicated that he had two years remaining on his probationary term.

wish to testify, Dawkins stated: "Because I got my own problems." Although Dawkins admitted that his trial testimony would not have any effect on his "own problems," Dawkins nevertheless insisted that his reluctance to testify was the result of his desire to "take care of my business." Dawkins thereafter testified that his unwillingness to testify was due to the fact that he thought that he had been summoned to court in connection with his own pending cases, which he wanted to resolve, but had learned belatedly that he was there to testify in the defendant's case.

In his lengthy cross-examination of Dawkins, the defendant also questioned Dawkins about any conversations he had had with the state about his pending charges.[14] The defendant also elicited the following admissions from Dawkins: (1) that he had not noticed whether the suspect had a moustache; (2) that he had been drinking throughout the day of July 19, 1993, and that he had had much more to drink than he originally indicated; (3) that he previously had lied in court; and (4) that he could not remember how dark it was at the time of the fatal shooting. Dawkins also acknowledged that he had been convicted of the crimes of robbery, larceny and failure to appear.[15] The defendant also adduced additional conflicting testimony from Dawkins regarding the various statements that he had given about the defendant's involvement in the events of July 19.[16] On redirect examination, Dawkins again identified

[14] Dawkins was steadfast in his denial that he had ever discussed his pending charges with the state.

[15] Dawkins testified that he had been convicted of failure to appear in 1995, robbery in the first degree in 1994, larceny in the third degree in 1992, larceny in the second degree in 1984 and robbery in the second degree in 1983.

[16] For example, Dawkins first said that he had told the truth in his statement exonerating the defendant, and then said that he had not been truthful in that statement. Later, Dawkins again said that the information in his exculpatory statement was true. He then reversed himself again, indicating that he had falsely exculpated the defendant in his jailhouse statement and in the similar statement that he had provided to the defendant's investigator.

the defendant as the person who had held a gun to his head on the night of the murder.

Prior to the defendant's recross-examination of Dawkins, defense counsel, out of the presence of the jury, renewed his request for permission to question Dawkins concerning "the fact that [Dawkins] at one point was refusing to testify and then was instructed by the court that he could receive a certain amount of jail time for every question he refused to answer." In support of his request, defense counsel argued that the trial court's explanation to Dawkins that he was required to testify and, if he did not, the likely consequences of his failure to do so, were relevant to establish that Dawkins had felt pressured to testify against the defendant. The trial court again sustained the state's objection to that specific line of questioning.

On appeal, the defendant does not challenge the trial court's ruling that Dawkins had no legitimate basis for asserting his fifth amendment privilege against self-incrimination, nor does the defendant claim that the trial court improperly warned Dawkins regarding the likely consequences of his refusal to testify.[17] Rather, the defendant asserts that, even though the court's admonition to Dawkins was proper,[18] the defendant nevertheless had a right to inform the jury that Dawkins

[17] The defendant also does not claim that the trial court improperly rejected the defendant's request to speak to an attorney. The defendant, however, suggests that, without legal advice, Dawkins was more susceptible to pressure by the court to resume his testimony.

[18] See, e.g., United States v. MacCloskey, 682 F.2d 468, 478 n.19 (4th Cir. 1982) ("the best procedure to follow after a witness has improperly invoked . . . [a testimonial] privilege . . . is to issue an order, outside of the jury's presence, directing [the witness] to testify and admonishing him [or her] that the continued refusal to testify would be punishable by contempt"); United States v. Zappola, 646 F.2d 48, 54 (2d Cir. 1981) ("[t]he procedure that should [be] followed by the [trial] court when faced with [a witness'] refusal to testify [is] [1] the issuance of an order, outside the presence of the jury, directing [the witness] to testify and [2] a warning that continued refusal to testify despite the court's order would be punishable by contempt").

agreed to resume testifying only after he had been informed by the court that he faced incarceration if he failed to testify. Specifically, the defendant claims that he was entitled to question Dawkins about the trial court's admonition to him concerning the consequences of his failure to testify in order to demonstrate that he had been pressured to resume his testimony against the defendant and, thus, the court's ruling denying the defendant the opportunity to question Dawkins in that regard violated the defendant's constitutionally protected right to confront the state's witness. We disagree with the defendant that the trial court improperly restricted his cross-examination of Dawkins.

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted." (Citation omitted; internal quotation marks omitted.) *State* v. *Gould*, 241 Conn. 1, 15–16, 695 A.2d 1022 (1997); accord *State* v. *Barletta*, 238 Conn. 313, 331, 680 A.2d 1284 (1996). However, "[t]he [c]onfrontation [c]lause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original; internal quotation marks omitted.) *State* v. *Moye*, 214 Conn. 89, 94, 570 A.2d 209 (1990). Thus, "[t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court

determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable. . . . [Furthermore, the] trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . [Finally, the] proffering party bears the burden of establishing the relevance of the offered testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Beliveau,* 237 Conn. 576, 585–86, 678 A.2d 924 (1996); see also *State* v. *Lee,* 229 Conn. 60, 70, 640 A.2d 553 (1994) (trial court has wide latitude to place reasonable limits on cross-examination "based upon concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant" [internal quotation marks omitted]).

When Dawkins refused to continue his testimony, he was forsaking a duty that "has long been recognized as a basic obligation that every citizen owes his Government." *United States* v. *Calandra,* 414 U.S. 338, 345, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974); see also *United States* v. *Bryan,* 339 U.S. 323, 331, 70 S. Ct. 724, 94 L. Ed. 884 (1950) ("[w]e have often iterated the importance of this public duty [to testify] which every person within the jurisdiction of the Government is bound to perform when properly summoned"); *Blackmer* v. *United States,* 284 U.S. 421, 438, 52 S. Ct. 252, 76 L. Ed. 375 (1932) ("[i]t is . . . beyond controversy that one of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving . . . testimony whenever he [or she] is properly summoned"). "It is the duty of all good citizens when legally required to do so to testify to any facts within

their knowledge affecting [the] public interest and . . . no one has a natural right to be protected in his refusal to discharge that duty." (Internal quotation marks omitted.) *Blodgett* v. *Cosgrove*, 117 Conn. 301, 306, 167 A. 925 (1933). Because of the importance of this obligation to the proper functioning of our judicial system, courts have the power to incarcerate witnesses who refuse to testify. E.g., General Statutes § 51-35;[19] see also Practice Book § 1-16.[20] Only a witness who can establish that he or she is entitled to invoke a recognized exception to the general obligation to provide testimony, such as the existence of a valid testimonial privilege, will be excused from testifying.[21]

For purposes of this appeal, it is undisputed that Dawkins had no legally valid reason for refusing to testify. In response to Dawkins' unjustified refusal to testify, the trial court properly explained to him that he was required to testify and informed him of the consequences of his continued refusal to do so. In so

[19] General Statutes § 51-35 provides in relevant part: "Witness refusing to testify; imprisonment. . . . (a) Any court or family support magistrate may commit to a community correctional center any person legally summoned who refuses to appear and testify before it in any case, there to remain at his own expense until he so testifies. . . ."

[20] Practice Book § 1-16 provides in relevant part: "A criminal contempt may be punished summarily if the conduct constituting the contempt was committed in the actual presence of the court . . . and such punishment is necessary to maintain order in the courtroom. . . ."

[21] "Certain exemptions from . . . giving testimony are recognized by all courts. But every such exemption is grounded in a substantial individual interest which has been found, through centuries of experience, to outweigh the public interest in the search for truth. Dean [John] Wigmore stated the proposition thus: 'For more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.' . . . [Thus, every] exemption from testifying . . . presupposes a very real interest to be protected." *United States* v. *Bryan*, supra, 339 U.S. 331–32.

advising Dawkins, the trial court did not suggest or imply that Dawkins should testify in any particular manner, either favorably or unfavorably to the defendant. Rather, the court, in neutral and appropriate terms, merely informed Dawkins that he was legally obligated to testify and that he faced incarceration if he wrongfully persisted in refusing to do so. Thus, the fact that Dawkins agreed to resume testifying in response to the court's warning bore no relation to any legitimate purpose of cross-examination, including the defendant's constitutionally protected right to question Dawkins about facts tending to show motive, interest, bias or prejudice. In other words, the defendant has not demonstrated how the trial court's admonition to Dawkins could have had even the slightest effect on Dawkins' credibility or veracity.

Furthermore, the defendant otherwise was afforded wide latitude in his cross-examination of Dawkins,[22] whose credibility was subject to attack on many fronts. For example, the defendant established that, at the time of trial, Dawkins: (1) was incarcerated, awaiting the resolution of several pending criminal charges; (2) had multiple prior convictions for robbery, larceny and failure to appear; (3) previously had lied under oath; and (4) had given two written statements in which he had fully and unequivocally exculpated the defendant, which was inconsistent with earlier statements given to the police. Moreover, the defendant was permitted to question Dawkins extensively regarding his refusal to testify and the reasons for his refusal. Finally, the defendant's testimony, on both direct and cross-examination, frequently was confusing and, at times, contradictory.

The defendant relies on one case, State v. Johnson, 21 Conn. App. 291, 573 A.2d 1218 (1990), to support his

---

[22] The defendant acknowledges that his cross-examination of Dawkins was extensive and effective.

claim that the trial court improperly barred him from questioning Dawkins about the court's admonition to Dawkins. In *Johnson*, the defendant had been charged with robbery. Id., 292. At trial, the state sought to elicit the testimony of Charles Douglas, who had reported to the police that the defendant robbed him of $6 at gunpoint. Id. Douglas initially had attempted to avoid testifying by seeking to invoke his constitutional privilege against self-incrimination. Id., 295. The trial court, however, informed Douglas that he was not entitled to invoke that privilege.[23] Id. Douglas also was warned that he could be charged with contempt for his refusal to testify, that he could be charged with perjury if he testified falsely and that he could be charged with making a false report to the police if he failed to provide testimony.[24] Id. Douglas thereafter agreed to testify and, on cross-examination, the defendant asked him the following question: " 'If you changed your story here you could be charged with making a false report . . . right?' " Id. The trial court ruled that the witness was not required to answer that question. Id. On appeal, the Appellate Court concluded that the trial court improperly had precluded the defendant from eliciting Douglas' response to the question, stating as follows: "The claim of bias that the defendant sought to develop was admissible to afford the jury a basis for an inference that there was potentially undue pressure placed on Douglas to testify. The question went to assessing the motive or bias of the complainant. It was error, therefore, to exclude the question." Id. The Appellate Court went on to conclude, however, that, under the circumstances,

---

[23] We note that, in *Johnson*, as in this case, there was no claim that the trial court improperly rejected the witness' assertion of his fifth amendment privilege.

[24] The trial court issued the first two warnings. Douglas' attorney informed the court that he had advised Douglas that he could be charged with making a false report if he refused to testify.

"the disallowing of that one question was inconsequential"; id., 296; and, therefore, the impropriety was harmless beyond a reasonable doubt. Id.

*Johnson* is distinguishable from this case because, in *Johnson,* the defendant sought to question the witness, Douglas, about the possibility of being prosecuted for making a false report, a prospect about which Douglas expressly had been advised,[25] and not, as in this case, about whether he would be held in contempt and incarcerated if he refused to testify. Because Douglas had a strong interest in testifying in accordance with his original complaint to avoid exposing himself to prosecution, either for making a false report or, alternatively, for perjury—a prospect about which he also had been warned by the trial court—the Appellate Court properly concluded in *Johnson* that the trial court should have allowed the defendant to cross-examine Douglas on that issue. In this case, by contrast, Dawkins was asked only whether he had been informed that he would be incarcerated if he refused to testify, not whether he faced prosecution for making a false report. Moreover, Dawkins was never advised that he was in any jeopardy for providing a false report to the police if he persisted in refusing to testify, nor was he informed that he faced a possible perjury charge if he testified in a manner inconsistent with the statements he previously had provided to the police. Thus, the defendant in *Johnson,* unlike the defendant in this case, had a viable claim that his cross-examination of the state's key witness had been unduly restricted.[26]

---

[25] It is not clear from the Appellate Court opinion in *Johnson* why Douglas, the victim of the robbery, had been so advised by his attorney. See generally *State* v. *Johnson,* supra, 21 Conn. App. 295. We may surmise, however, that his attorney was concerned that the state might charge Douglas with making a false report if he refused to testify because, as the complainant, his refusal to provide testimony reasonably could have been viewed by the state as an indication that his complaint was false.

[26] We do not know why the Appellate Court in *Johnson* indicated that the warnings given to Douglas "afford[ed] the jury a basis for an inference

In sum, we are not persuaded that any "pressure" Dawkins may have felt as a result of the warning he received regarding the consequences of his failure to testify bore any relation to Dawkins' veracity as a witness. Accordingly, we reject the defendant's confrontation clause claim.

II

The defendant also claims that we should grant him a new trial due to the prosecutor's allegedly improper rebuttal argument to the jury. The defendant does not contend that his constitutional rights were violated by the alleged misconduct. Rather, he contends that, in light of the nature of the alleged misconduct, we should reverse his conviction in the exercise of our supervisory authority over the administration of justice. We are not persuaded.

The following additional facts are necessary to our disposition of this claim. In his rebuttal argument, the prosecutor made the following comments: "Ask yourselves this, ladies and gentlemen [of the jury]. If [the defendant] was not the one who was out there with the gun and the camouflage jacket that night, how would he even know that . . . Dawkins was a witness in this case? How would he know that? Because we all know from what . . . Dawkins has said that they don't know

that there was potentially *undue* pressure placed on Douglas to testify." (Emphasis added.) *State* v. *Johnson*, supra, 21 Conn. App. 295. If the warnings given to Douglas were proper—and there is nothing in the opinion of the Appellate Court to suggest otherwise—then we do not understand why any "pressure" to testify that may have been placed upon Douglas as a result of those warnings fairly may be characterized as potentially "undue" influence. Nevertheless, the question posed to Douglas by the defendant was relevant to the issue of whether Douglas had an interest in testifying in a manner consistent with his complaint to the police; accordingly, we do not quarrel with the Appellate Court's conclusion that, in the circumstances of that case, the trial court should have allowed the defendant to query Douglas about the possibility that he could be charged with filing a false report if he changed his story.

each other, they've never seen each other before. Never. The only opportunities they've ever had to see each other would have been the night of the shooting and when they end up at [the correctional center] together back in February of [1996]. That was it. That was it.

"[S]o [the defendant] is sitting in a cell and he knows he's accused of murder, but he doesn't know what his accuser looks like. He doesn't know . . . Dawkins at all. But, yet, for some unexplained, inexplicable reason, an unknown inmate is sent over to . . . Dawkins and . . . Dawkins is told to write a statement about that shooting and you say that [the defendant] had nothing to do with it and that you were drunk. How did that happen? How did [the defendant] suddenly come to some sort of realization, jeez, this is the fellow who's accusing me, let me get a statement from him, how did that happen? The only way that could have ever happened, ladies and gentlemen, is because [the defendant] was out there that night and he knows whose face he had that gun to. It must have [come as] quite a surprise to him when he suddenly found . . . Dawkins a cell or two away from him back in February of 1996."

At trial, the defendant raised no objection to these comments. On appeal, however, the defendant claims that the prosecutor's rebuttal argument was improper because, in light of the rules of discovery applicable in criminal cases; see generally Practice Book § 40-1 et seq., formerly Practice Book § 732 et seq.; there is a likelihood that the defendant was aware of Dawkins' identity not because he was the person who had accosted Dawkins on the evening of July 19, 1993, but, rather, by virtue of the information provided to him by the state under our rules of practice relating to discovery in criminal matters.

"We have previously acknowledged that prosecutorial misconduct can occur in the course of closing

argument." *State* v. *Atkinson*, 235 Conn. 748, 768–69, 670 A.2d 276 (1996). Moreover, "even when prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . Such a sanction generally is appropriate, [though], only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Citations omitted; internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 811–12, 699 A.2d 901 (1997). As we previously have noted, however, "[i]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Williams*, 231 Conn. 235, 246, 645 A.2d 999 (1994); accord *State* v. *Robinson*, 227 Conn. 711, 746, 631 A.2d 288 (1993). "Furthermore, we must review the comments complained of in the context of the entire trial." *State* v. *Robinson*, supra, 746.

Because the defendant did not raise a contemporaneous objection to the prosecutor's remarks, the record on appeal does not reflect whether, at the time Dawkins was approached by the defendant's emissary seeking the exculpatory statement, the defendant already was aware of Dawkins' identity as a result of the state's disclosure of that information to him under our discovery rules. We will not presume bad faith by the prosecutor in the absence of a showing by the defendant of such deliberate misconduct.[27] Moreover, defense counsel's

---

[27] We note, moreover, that, according to the state, the trial court record is fully consistent with the conclusion that the defendant was unaware of Dawkins' identity as of February 10, 1996.

failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. See, e.g., *State* v. *Satchwell*, 244 Conn. 547, 565, 710 A.2d 1348 (1998) (defendant's failure to object to prosecutor's closing argument indicated that defendant did not consider it to be seriously prejudicial); *State* v. *Robinson*, supra, 227 Conn. 745–46 (same).

However, even if it is assumed, arguendo, that the prosecutor should have refrained from making the challenged comments, we cannot say that they were so offensive as to require reversal of the defendant's conviction under our supervisory authority, a power that we exercise only with great caution and when clearly warranted by compelling circumstances. See, e.g., *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998). In this case, no claim has been made that the prosecutor's allegedly objectionable argument compromised the fairness of the defendant's trial, or that the prosecutor's conduct during the trial otherwise was improper in any way. Under these circumstances, the defendant has not demonstrated that the drastic remedy of a new trial is necessary to deter such alleged misconduct in the future. Accordingly, we reject the defendant's invitation to invoke our supervisory powers to reverse his conviction and grant him a new trial.

The judgment is affirmed.

In this opinion the other justices concurred.