STATE OF CONNECTICUT *v.* LEOTIS PAYNE
(SC 16554)

Sullivan, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued January 11—officially released June 11, 2002

*Conrad Osl Seifert*, special public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael A. Pepper*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The sole issue in this appeal is whether, in the exercise of our supervisory authority over the administration of justice, the defendant should be afforded a new trial because of pervasive prosecutorial misconduct during the closing arguments of his trial. The defendant, Leotis Payne, appeals from the judgment of the Appellate Court affirming his conviction, rendered after a jury trial, of felony murder in

violation of General Statutes § 53a-54c,[1] robbery in the first degree in violation General Statutes § 53a-134 (a) (2),[2] robbery in the second degree in violation of General Statutes § 53a-135 (a) (1),[3] larceny in the second degree in violation of General Statutes § 53a-123 (a) (3),[4] carrying a pistol without a permit in violation of General Statutes § 29-35[5] and criminal possession of a firearm in violation of General Statutes (Rev. to 1993) § 53a-217 (a).[6] *State* v. *Payne*, 63 Conn. App. 583, 777 A.2d 731 (2001). The defendant claims that during the trial the prosecutor engaged in improper conduct including: (1) stating that the defendant likely was involved in another crime after the one for which he was being tried; (2) appealing to and inflaming the jury's emotions; (3) vouching for the credibility of a prosecution witness and his own credibility as a prosecutor; and (4) stating that the defendant had a strong motive to lie to the jury because he was going to receive a

[1] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[2] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[3] General Statutes § 53a-135 (a) provides in relevant part: "A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and (1) he is aided by another person actually present . . . ."

[4] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (3) the property, regardless of its nature or value, is taken from the person of another . . . ."

[5] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon one's person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

[6] General Statutes (Rev. to 1993) § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm . . . when he possesses a firearm . . . and has been convicted of . . . a class A felony . . . ."

substantial sentence if convicted in this case. The state counters that reversal would be inappropriate in this case because prejudice to the defendant was nonexistent or minimal, retrial would have practical problems and cause emotional trauma to victims, and there were other adequate sanctions available. We agree with the defendant and reverse the judgment of the Appellate Court.

## I

## FACTS AND PROCEDURAL HISTORY

The opinion of the Appellate Court contains the following facts. "On October 24, 1994, Jose Marrero, his future wife, Amy Cobain, Devon McFarlane and the victim, Louis Hood (victim's group), were on Frank Street in New Haven. Marrero, Hood and Cobain entered a store for the purpose of getting change for Marrero's $100 bill. At the same time, the defendant, Eaker McClendon and Alexander Lacks (defendant's group) were outside the store, talking with Steven Thomas. The defendant's group also entered the store when Marrero attempted to change his $100 bill.

"While returning to Hood's residence, the victim's group was followed by the defendant's group. Thereafter, the defendant approached Cobain and placed a gun to her head. Marrero jumped between the defendant and Cobain, and urged the defendant in street parlance not to shoot. Cobain and McFarlane ran off down the street. The defendant then told Marrero to give up his valuables, proceeded to rifle through his pockets and removed his money. The defendant then backed up and began to squeeze the trigger of his handgun. Hood was fatally shot in his attempt to push Marrero away. Cobain and McFarlane heard the shot. McFarlane glanced back and saw the defendant with a gun in his hand.

"Officer Edwin Rodriguez of the New Haven police department was the first police officer to arrive at the

scene. He observed Hood motionless and unconscious on the ground with a bullet wound in his left arm. No handgun or spent shells were found at the scene. An autopsy revealed that Hood's left arm had been crossed in front of his chest when he was shot. The bullet struck his arm and moved through his chest cavity." Id., 585–86.

The defendant was convicted after a jury trial and subsequently appealed his conviction to the Appellate Court. The defendant claimed that the trial court improperly: (1) failed to dismiss a juror who appeared to have slept during the trial; (2) refused to grant a new trial because of allegedly improper remarks by the prosecutor; (3) gave the jury instructions relative to the defendant's consciousness of guilt; and (4) instructed the jury that reasonable doubt is not doubt suggested by the " 'ingenuity of counsel.' " Id., 585. After the Appellate Court affirmed the judgment of the trial court; id.; we granted the defendant's petition for certification to appeal limited to the following issue: "In the exercise of our supervisory authority over the administration of justice, should the defendant be afforded a new trial due to pervasive prosecutorial misconduct during closing argument?" *State* v. *Payne*, 257 Conn. 904, 777 A.2d 195 (2001). We conclude that he should.

## II

## SUPERVISORY AUTHORITY

Although prosecutorial misconduct is often examined under the rubric of a defendant's due process protections, as in our recent decision in *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), our review in the present case is limited to whether reversal is required under our supervisory authority. "As an appellate court, we possess an inherent supervisory authority over the administration of justice. . . . The standards that we set under this supervisory authority are not satisfied

[merely] by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice." (Citations omitted; internal quotation marks omitted.) *State* v. *Jones*, 234 Conn. 324, 346–47, 662 A.2d 1199 (1995). "Of course, our supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Thus, [e]ven a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions." (Citation omitted; internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 813, 699 A.2d 901 (1997).

"[W]hen prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. See, e.g., *State* v. *Ubaldi*, [190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983)]; see also *State* v. *Ruiz*, 202 Conn. 316, 330, 521 A.2d 1025 (1987)." *State* v. *Pouncey*, supra, 241 Conn. 811–12. In *Pouncey*, we previously have recognized that reversal is appropriate when there has been a pattern of misconduct across trials, not just within an individual trial. Id., 815–16 (noting that "the defendant does not claim either that the assistant state's attorney in this case previously has used racially charged rhetoric in her arguments to other juries" and concluding that "[i]f such a pattern or practice of misconduct were discernible . . . reversal of the defendant's conviction would serve the important purpose of demonstrating that such conduct cannot, and will not, be tolerated").

Accordingly, we exercise our supervisory authority in this context to redress repeated and deliberate misconduct by a prosecutor seeking to increase the likeli-

hood of conviction even though that conduct does not necessarily require reversal as a due process violation. In accordance with the cases cited previously, we pay particular attention to the fact that the prosecutor knew or should have known that the conduct was improper and was part of a pattern of similar misconduct in other cases. We exercise our supervisory authority in order to protect the rights of defendants and to maintain standards among prosecutors throughout the judicial system rather than to redress the unfairness of a particular trial. We do so in order "to send a strong message that such conduct will not be tolerated." Id., 812.

The standards by which we evaluate claims of prosecutorial misconduct are shaped by the unique role prosecutors have in our judicial system. "[T]he prosecutor, as a representative of the state, has a duty of fairness that exceeds that of other advocates. [A] prosecutor is not an ordinary advocate. His [or her] duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury. . . . [B]y reason of his [or her] office, [a prosecutor] usually exercises great influence upon jurors. His [or her] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because [a prosecutor] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment." (Internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 336, 746 A.2d 761 (2000).

Despite this special role, not all improper statements by a prosecutor amount to prosecutorial misconduct. "[I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal

quotation marks omitted.) *State* v. *Andrews*, 248 Conn. 1, 19, 726 A.2d 104 (1999). If a prosecutor does exceed these limits, we generally balance the seriousness of the infraction against the difficulties that might arise in a new trial, including "the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct. *United States* v. *Hasting*, 461 U.S. 499, 505–507, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983); *State* v. *Ubaldi*, supra, [190 Conn.] 572." *State* v. *Ruiz*, supra, 202 Conn. 330.

## III

## NATURE OF THE MISCONDUCT

The prosecutor in the present case made statements during his closing argument that can only be characterized as improper. Moreover, we conclude that the prosecutor knew or should have known that the statements were improper and that they reflect a pattern of misconduct on his part. It is of no consequence that all of the improper statements in the present case were made during the state's closing argument. *State* v. *Atkinson*, 235 Conn. 748, 768–69, 670 A.2d 276 (1996). We review separately each instance of misconduct.

## A

First, the prosecutor improperly vouched for the credibility of one of his witnesses and directly testified that he did not tell the witness to lie. Leon Sowell, a witness for the defense, testified that, while he was confined with McFarlane, a prosecution witness, McFarlane told Sowell that a prosecutor wanted McFarlane to be a witness to a crime that he had not actually seen. Responding to Sowell's testimony in his closing

argument, the prosecutor stated: "I guess the claim is that I am telling witnesses like [McFarlane] that you got to testify to something you didn't see. Well, if that's the claim, let me make this clear to you. I understand that that's wrong, and I also understand that I am not really, I don't really want to lose my job for doing something like that." The defendant did not object to this statement.

"The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions." (Citations omitted.) *State* v. *Williams*, 204 Conn. 523, 541–44, 529 A.2d 653 (1987). "While the prosecutor is permitted to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." *State* v. *Oehman*, 212 Conn. 325, 336, 562 A.2d 493 (1989).

We conclude that, in making the challenged statement, the prosecutor improperly vouched for the credibility of the witness. By personally refuting Sowell's properly admitted testimony that McFarlane had been told to lie, the prosecutor lent his credibility, as a representative of the state, to his witness, together with his accompanying knowledge of facts not in evidence. The prosecutor's assurance to the jury implied that he knew, presumably from facts not in evidence, that Sowell was lying. The prosecutor compounded the act of vouching for the witness by putting his own employment in issue

before the jury, thereby interjecting a fact not in evidence and heightening the personal stake he had in McFarlane's credibility. This interfered with the jury's independent evaluation of the veracity of each witness. In addition to being an improper attestation to the credibility of his witness, the prosecutor's statement constituted unsworn and unchecked testimony that McFarlane had not been told to lie and, by implication, that Sowell had lied in his testimony. The statement was not based on properly admitted evidence in the case suggesting that McFarlane was being truthful or that Sowell was not.

The prosecutor in the present case has demonstrated a pattern of vouching for witnesses and lending his credibility as a prosecutor to witnesses. In *State* v. *Lacks*, 58 Conn. App. 412, 755 A.2d 254, cert. denied, 254 Conn. 919, 759 A.2d 1026 (2000), which involved the felony murder prosecution of another defendant based on the same incident as the present case, the same prosecutor made a very similar closing argument. He stated: "I would submit to you, where is [McFarlane's] motivation to lie now? There is no motivation for . . . McFarlane to lie, to make this up and come in here. . . . Well, let me tell you something, ladies and gentlemen, that I have a lot better things to do than put on a case where . . . Marrero or . . . McFarlane wants to get their chunk of change here. There are a lot of other cases here. They are not calling the shot in this case. I filed the information. My name is on the information. I brought the charges here."[7] In other words, the prosecutor personalized the decision to bring charges based on his witnesses' testimony, sug-

---

[7] These comments were reviewed by the Appellate Court under a due process analysis, and deemed to be improper. The Appellate Court nonetheless affirmed the judgment of conviction in that case, concluding that the improper vouching was not pervasive enough to affect the fundamental fairness of the trial. *State* v. *Lacks*, supra, 58 Conn. App. 421–24.

gesting that he would not have done so unless he believed McFarlane and Marrero and that he believed the defendant was guilty. This statement vouched for the credibility of the prosecutor's witnesses. It also emphasized the credibility of the prosecutor and his office and conveyed to the jury the prosecutor's personal belief that the defendant was guilty. Thus, the prosecutor took advantage of his role as an administrator of justice and urged the jury to convict on the basis of his belief that the defendant was guilty instead of on the basis of the jury's evaluation of the evidence.

## B

Next, the prosecutor told the jury that the defendant probably had been involved in a second robbery even though there was no evidence suggesting that to be true. The defendant had been arrested when he visited a hospital for treatment of a gunshot wound a few days after the victim was killed. In a reference to the fact that the defendant had been shot, the prosecutor stated: "The defendant makes some claim now that it was the shooting of him on the 26th of October was retribution. He thinks that was a payback. . . . There has been no indication that this was reprisal. This was some other event that [the defendant] got into. *He probably got himself involved in another robbery a couple of days later* . . . ." (Emphasis added.) The defendant objected to that statement. Although the court neither struck the statement nor instructed the jury to ignore it, the court did state: "All right. That's not in evidence, that's not in evidence. . . . There's no foundation for this. It's not a logical or reasonable inference. There's no foundation."

"[W]hile a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Thus, the privilege of counsel in

addressing the jury . . . must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Citation omitted; internal quotation marks omitted.) *State* v. *Copas*, supra, 252 Conn. 336–37. "A demonstrated deliberate effort by a prosecutor to influence the jury against the defendant through the attempted introduction of obviously inadmissible evidence may entitle the defendant to a new trial." *State* v. *Baker*, 182 Conn. 52, 58, 437 A.2d 843 (1980).

There were no facts in evidence to suggest that the defendant's gunshot wound was the result of his involvement in another robbery in the days after the robbery for which he was being prosecuted. The prosecutor's statement to that effect was rank speculation; more importantly it invited the jury to conclude that the prosecutor, by virtue of his position, had evidence to that effect that had not been introduced. To the extent that the improper statement encouraged the jurors to ponder the defendant's apparent proclivity for violent robberies, it distracted them from their duty to decide the case on the evidence properly before the court.

Although improper on its own, this comment by the prosecutor was also part of a larger pattern of particularly serious misconduct. First, the prosecutor had clear warning that reference to the possibility of another robbery was improper, and the reference in closing argument was in direct defiance of an earlier trial court ruling. While cross-examining the defendant, the prosecutor had asked: "And then a couple of nights later you were involved in another robbery, weren't you, sir?" The defendant objected, and the court ruled: "It's prejudicial. It's not probative. It's collateral. Sustain the objection. Strike it. . . . As it stands there, there is no foundation. There is no linkage to tie it to this case."

Despite this adverse ruling, the prosecutor, without any evidentiary support, asserted in closing argument that, "[h]e probably got himself involved in another robbery a couple of days later . . . ." Both the improper question and the improper argument were made on the same day, leaving little doubt that at least the second reference was an intentional and calculated effort to suggest to the jury that the defendant had been involved in another robbery. This, in turn, was an effort to obtain a conviction by leading the jury to reach inferences not based on facts in evidence. In *State* v. *Ubaldi*, supra, 190 Conn. 564–65, a prosecutor similarly sought to introduce evidence of another potential crime through his cross-examination, was prohibited from doing so by the court and then brought it up again in his closing argument. On appeal, we stated: "The prosecutor's argument to the jury was improper both because the inference sought was clearly impermissible and because it demonstrated a complete disregard for the tribunal's rulings. The record of the proceedings affords no reasonable inference that this remark of an experienced prosecutor was inadvertent and on appeal the state wisely makes no such claim." Id., 567–68. We also noted that the trial court did not admonish the prosecutor upon the defendant's objection to the improper argument. Id., 574. We concluded that "[w]here a prosecutor in . . . argument interjects remarks deliberately intended to undermine the rulings of the trial court to the prejudice of the defendant, his conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." Id., 575. Accordingly, we reversed the judgment of conviction. The misconduct in the present case is equally improper for the same reasons. Therefore, reversal in this case would be appropriate on this ground alone.

Moreover, this conduct was also part of a pattern of similar misconduct in other cases by the same prosecu-

tor. In *State* v. *Butler*, 55 Conn. App. 502, 505, 739 A.2d 732 (1999), aff'd, 255 Conn. 828, 769 A.2d 697 (2001), several defendants were being prosecuted for involvement in the same crime, and one witness testified against all of them in their respective trials. On several occasions, the court instructed the parties not to mention that the trials of the first two defendants had resulted in guilty verdicts. Id., 510. In closing argument, the defendant attacked the credibility of the witness by asserting that he lied to many people involved in the case, including other juries, but did not mention the outcome of the other trials. Id., 505. In rebuttal, this prosecutor stated: "Well, let me tell you, ladies and gentlemen, I wish I could tell you what other juries decided, but I am not allowed to." (Internal quotation marks omitted.) Id., 506. The defendant moved for, among other things, a mistrial, which the trial court declined to order, but it agreed to issue a curative instruction. Id. On appeal, the Appellate Court reversed the conviction under a due process analysis and remanded the case for a new trial. Id., 519. The critical element that *Butler* has in common with the present case is that on both occasions the trial court disallowed certain information, and, nonetheless, with full knowledge of the impropriety of his actions and in complete disregard for the ruling of the court, the prosecutor conveyed that information to the jury during closing argument.

C

Third, the prosecutor stated that the defendant had a strong motivation to lie because of a likelihood that he could be incarcerated for a long period of time if convicted. The prosecutor stated: "Who's got a major league interest in this case as we speak? The defendant is the one with major league interest in this case. Now I don't think any of you expected a courtroom confession. I think that's something we occasionally see on

Perry Mason or on TV, but it doesn't happen here. I would submit to you, ladies and gentlemen, that the defendant in this case has such an interest that it would tempt a lot of people to distort the truth, to lie on the stand. He's a convicted felon, remember? He knows if he is convicted he will probably get a substantial sentence in this case. He has an extreme interest in trying to deceive you and you are the finder of fact in this case." The defendant did not object to this statement.

While a prosecutor may point out that the possibility of incarceration may give a defendant a motive to lie; *Agard* v. *Portuondo*, 117 F.3d 696, 711 (2d Cir. 1997), rev'd on other grounds, 529 U.S. 61, 75–76, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000); the prosecutor in this case exceeded the proper bounds of such an argument. The statement that the defendant knew he would receive a "substantial" sentence merely reflected the prosecutor's opinion on the likely length of the defendant's sentence and on whether the defendant, like the prosecutor, anticipated a "substantial" sentence if convicted. Moreover, the prosecutor's argument went beyond pointing out that the possibility of incarceration might have provided the defendant with motivation to lie. Cf. *State* v. *Dudley*, 68 Conn. App. 405, 414 n.4, 791 A.2d 661 (prosecutor stated "don't forget to consider what interest the defendant has in the outcome of this case. Clearly, he has a motive to lie or to hide the truth. His motive to lie would be the fact that he faces here a criminal conviction." [Internal quotation marks omitted.]), cert. denied, 260 Conn. 916, 797 A.2d 515 (2002). Instead, the prosecutor expressed his opinion on the defendant's situation and couched it in excessive and unwarranted language. While the potential motivation to lie was properly pointed out to the jury, the prosecutor's assessment and description of it was not.

Yet again, this misconduct was part of a larger pattern of conduct by the prosecutor that he should have known

was improper. Specifically, he used the same argument and reasoning during the closing argument of his prosecution of Lacks for Lacks' involvement in the same robbery. The transcript in that case reflects that the prosecutor stated: "I will ask you to ask yourselves, what motivation did he, the defendant, have to lie or distort the truth in his favor. I would submit to you, ladies and gentlemen, that the defendant has a very large interest in this case. . . . He has ten prior felony convictions. He knows if he is convicted of these charges he is going to do a lot of time. . . . Why is he telling you that story? Because he has nothing to lose? I would submit he has nothing to lose by trying to deceive you, ladies and gentlemen." The similarity of these statements indicates that the prosecutor's improper statement was not the result of being caught up in the heat of argument; rather, it was a deliberate and calculated trial tactic. Although the prosecutor made this argument in the defendant's trial prior to the Appellate Court's determination that it was improper in the trial of Lacks; *State* v. *Lacks*, supra, 58 Conn. App. 421–24; the prosecutor should have known that it exceeded the proper bounds of argument, and the similarity of the statements indicates that the misconduct was deliberate.

## D

Fourth, the prosecutor improperly appealed to the jury's emotions by seeking sympathy for the victim's family and inflaming anger against the defendant. The prosecutor stated: "Ask yourselves, is that what our law is all about here? Are victims of crime going to have to continually defend themselves, their family, their friends from the grave? Because we all know that is impossible. [The victim] doesn't deserve to be treated like that in life or in death. His name [besmirched, his family besmirched] mudslinging. He can't defend himself. And the defendant, the defendant knows that.

That's why we heard the stories we did. All his family has left is his picture. Now on a slab, on a cutting board. Let them have, let them, let his family come away from this trial with one good thing out of it. They heard a lot of negative things in this trial, a lot of accusations that have not been proven against him, his friends, his family. Let them come away with one positive thing. Let them have a memory of [the victim] that they can go back home with. Let them come away with a guilty verdict against the person that put a twenty-five caliber bullet into his body." This statement came at the end of the prosecutor's closing argument and the end of the day. The defendant did not object immediately but did so at the start of proceedings the next day, out of the presence of the jury. The court responded that it usually instructs juries not to be influenced by sympathy in their deliberations. During its jury instruction, the court stated: "Nor should you be influenced by any sympathy for the accused and his family, nor for the victim and his family . . . or any other person who might be affected by your decision."

It is well settled that "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . We have stated that such appeals should be avoided because they have the effect of diverting the jury's attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 545–46. A similar example of just such an appeal to a jury's emotion can be found in *State* v. *Mills*, 57 Conn. App. 202, 748 A.2d 318, cert. denied, 253 Conn. 914, 915, 754 A.2d 163 (2000), where the Appellate Court ordered a new trial because of prosecu-

torial misconduct. The prosecutor in *Mills* stated that the state and the victim wanted justice and justice required a conviction for murder, the victim was not going to be a nameless, faceless, slab of meat on an autopsy table, and the victim could not come to court to tell his story. Id., 209–11 and 210 n.14.

Likewise, the prosecutor's statement in the present case was a direct and unabashed appeal to the jury to find the defendant guilty out of sympathy for the victim and his family. The prosecutor indicated that only a guilty verdict would protect our legal system. Moreover, the description of the victim "on a slab, on a cutting board" was calculated to inflame the passions of the jury against the defendant as much as to engender sympathy for the victim and his family. Finally, the prosecutor portrayed the defendant's defense as seeking to capitalize on the deceased victim's inability to be present at the trial. This experienced prosecutor flagrantly violated a rule that is so basic we can only conclude it was deliberate. Such deliberate appeals to juror sympathy cannot, and will not, be countenanced.

The instances of prosecutorial misconduct in the present case were serious and deliberate. Equally important to our review under this court's supervisory authority however, is that they were also part of a pattern of misconduct by this prosecutor that included repeated and direct disregard of trial court rulings, deliberate introduction of inadmissible evidence, vouching for witnesses and improper attacks on the credibility of defendants.

## IV

### APPROPRIATENESS OF NEW TRIAL

Having concluded that the prosecutor engaged in a pattern of deliberate misconduct, our determination of whether reversal is warranted requires us to balance

society's interest in maintaining a justice system that treats all defendants fairly and *appears* to do so, against some of the difficulties that might arise in a new trial, including "the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." *State* v. *Ruiz*, supra, 202 Conn. 330. We conclude that a new trial is warranted in the present case.

First, the misconduct in the present case significantly prejudiced the defendant. Because of a lack of physical evidence, the state and the defense both depended heavily on eyewitness testimony, necessarily making the credibility of witnesses the crux of the jury's analysis. The misconduct in the present case directly attacked the credibility of witnesses and the defendant, and the reference to another possible robbery by the defendant increased the possibility that the defendant was convicted on the basis of either inferences not grounded on facts in evidence or a perceived criminal predisposition. We note, moreover, that improper statements during closing arguments may have a profoundly serious effect because they are "[a]mong the final words of persuasion the jury [hears] before deliberation . . . ." *State* v. *Pouncey*, supra, 241 Conn. 819 (*Norcott, J.*, dissenting). Although the trial court delivered corrective jury instructions, this prosecutor's misconduct was typical of a larger pattern of misconduct that significantly prejudiced this defendant and others, and was not likely corrected by the instructions.

Second, we must consider the emotional trauma to victims that might result from living through a new trial. Any time those affected by a violent crime are forced to relive their experiences in a new trial, the emotional trauma is significant. In this case, Marrero, Cobain and

McFarlane will have to relive the experience of being robbed at gunpoint and being present while their companion was shot and killed. The family of the victim will be required to endure another trial. These highly unfortunate consequences, however, do not outweigh the compelling reasons that exist for reversing the conviction in light of the multiple, extraordinary instances of prosecutorial misconduct.

Third, the possibility of memory loss and concerns about the unavailability of witnesses are not significant enough to outweigh our reasons for reversing the judgment of conviction. Although years have passed since the incident and the first trial, most of the witnesses were young at the time and it is not likely that their memories will have been seriously impaired as a result of the delay necessitated by a new trial.

Finally, we must consider the availability of other sanctions. We have stated that reversal of a conviction under our supervisory authority "generally is appropriate . . . only when the '[prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal.' *State* v. *Ubaldi*, supra, [190 Conn.] 575." *State* v. *Pouncey*, supra, 241 Conn. 812. "Some tribunals have declined to use such supervisory power on the theory that society should not bear the burden of a new trial because of prosecutorial misconduct where a new trial is not constitutionally mandated. . . . According to some authorities, the evil of overzealous prosecutors is more appropriately combatted through contempt sanctions, disciplinary boards or other means. . . . This court, however, has long been of the view that it is ultimately responsible for the enforcement of court rules in prosecutorial misconduct cases. . . . Upsetting a criminal conviction is a drastic step, but it is the only feasible deterrent to flagrant prosecutorial misconduct in defiance of a trial court

ruling. We are mindful of the sage admonition that appellate rebuke without reversal ignores the reality of the adversary system of justice. The deprecatory words we use in our opinions . . . are purely ceremonial. Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of [verbal criticism without judicial action]—recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary." (Citations omitted; internal quotation marks omitted.) *State* v. *Ubaldi*, supra, 571. Merely to reprimand a prosecutor who disregards the authority of a trial court and engages in deliberate conduct that undermines the fairness of a trial would not sufficiently convey our strong disapproval of such tactics. We conclude that the prosecutor in this case repeatedly committed serious prosecutorial misconduct and our experience counsels that nothing short of reversal will deter similar misconduct in the future. Accordingly, mindful of the serious nature of the charges against the defendant, the weight of the evidence against him, and the significant societal and institutional costs of retrying him, we reverse the judgment of conviction and order a new trial.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case for a new trial.

In this opinion the other justices concurred.