******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOE BALTAS
(SC 18633)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Vertefeuille, Js.

*Argued September 18, 2013—officially released June 3, 2014*

*Pamela S. Nagy*, assigned counsel, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael Pepper*, senior assistant state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Joe Baltas, was convicted, after a trial by jury, of one count of murder in violation of General Statutes § 53a-54a (a),[1] two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), one count of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), one count of burglary in the first degree in violation of § 53a-101 (a) (2),[2] and one count of kidnapping in the second degree in violation of General Statutes § 53a-94 (a). The defendant has appealed from his conviction directly to this court,[3] claiming that the trial court improperly: (1) excluded evidence that the defendant claims was highly relevant to his defense, thus violating the defendant's constitutional right to present a defense and also preventing the defendant from engaging in cross-examination regarding that evidence, thus violating the defendant's constitutional right to confrontation; (2) failed to give a hybrid third party culpability jury instruction or, in the alternative, failed to instruct the jury on the defendant's theory of his defense; (3) refused to instruct the jury regarding the motive of one of the complaining witnesses to testify falsely; and (4) refused to reverse the defendant's convictions, which the defendant claims were tainted by improper comments made by the prosecutor in this matter. Because we conclude that certain evidence relating to the potential impeachment of Misty Rock, a prosecution witness, should have been admitted and that the state has not proven that the failure to admit that evidence was harmless beyond a reasonable doubt to the defendant as it relates to his conviction for the crimes of kidnapping in the second degree and burglary in the first degree, we reverse the judgment of the trial court as to those counts only and order a new trial. We affirm the judgment of the trial court in all other respects.

The jury reasonably could have found the following facts. The defendant was involved in a relationship with Rock, one of the complaining witnesses in this case, from December, 2005 until October, 2006. At some point during the month of October, the two discussed leaving Meriden, the town in which both of them lived, to start a new life in South Carolina.

On October 25, 2006, Rock was living with her brother, Christopher Laverty (Christopher), her mother, Linda Laverty (Linda), and her stepfather, Michael Laverty (Michael). At approximately 10 p.m., Linda and Michael were sitting in the living room of their apartment watching a movie, while Christopher and Rock were on the second floor of the home. Christopher came downstairs and opened the door to the basement, intending to check on the status of a load of laundry. As he opened the basement door, he encountered a masked person who was dressed all in black, wearing a ski mask, and holding at least one knife. The masked

person stabbed Christopher in the stomach, and then moved out of the basement and into the living room, where he proceeded to fatally stab Michael.[4] The masked person then turned to Linda, stated "die, bitch," and stabbed her in the neck. Linda later testified that she recognized the masked person as the defendant because of his eyes, the sound of his voice, and his body mannerisms. The masked person walked to the staircase leading to the upper floor of the home, and while on the staircase, he ran into Rock, who had heard the commotion from upstairs. In the collision, the masked person's knife went through Rock's sweatshirt and t-shirt and inflicted a scratch on her stomach. The masked person then forced Rock in front of him, grabbed her by the hair, and forced her out of the apartment.[5] While this was happening, Christopher grabbed a knife from the kitchen and a telephone and exited the home, running next door to ask a neighbor to call the police. Rock and the masked person then exited the apartment and were walking down the street, away from the apartment. Christopher attempted to stop them, and Rock told him to stop and not come any closer. Christopher then sat down on a bench and called the police himself, identifying the defendant as the masked person who had just assaulted his family.

The defendant and Rock then walked to an abandoned car and sat in it. Rock testified that, at this point, the defendant told her that he had killed Michael and stabbed Linda and, although Rock could not remember if the defendant was still wearing a mask, Rock recognized his voice. The defendant and Rock waited in the car until Rock informed the defendant that she needed to use the bathroom. The defendant led Rock to the Pulaski School, at which point the defendant—who at that time was not wearing a ski mask or a dark shirt—and Rock were confronted by police officers. The police observed the defendant holding a butter knife in his hand and told him to drop it. When the defendant did not comply with their command, the police tasered him and he fell to the ground; as he did so, a folding knife later found to be stained with Michael's blood fell out of the defendant's pocket.

A K-9 officer was also dispatched as a result of Christopher's 911 call, and the officer's dog tracked the path that the defendant and Rock took away from the apartment. The K-9 officer also had his dog perform an "article recovery . . . ." Between the K-9 officer's search and the actions of other police officers in the area, the following items along the path taken by the defendant and Rock were recovered that evening: (1) a ski mask, the interior of which later tested positive for the defendant's DNA, and the exterior of which tested positive for Michael's blood; (2) a dark, bloody shirt which tested positive for the blood of Linda and Michael; (3) a latex glove stained with the blood of Linda and also possibly of Michael; and (4) a long knife stained with the blood

of Michael, which the state medical examiner later concluded was the weapon that caused his fatal wounds. Tests also indicated that Michael and Linda were the sources of various bloodstains found on the defendant's pants, sneaker, and arms when he was arrested. Finally, the police matched a shoe print that was formed in blood at the crime scene to the shoe of the defendant.

In addition to the crimes of which he was convicted, the defendant was also charged with two counts of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a (a), one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (2), one count of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), and one count of kidnapping in the first degree in violation of § 53a-92 (a) (2) (C). The court granted the defendant's motion for judgment of acquittal with regard to the second degree assault charge, and the defendant was acquitted of both attempted murder charges and both first degree kidnapping charges. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

## RIGHT TO PRESENT A DEFENSE AND RIGHT TO CONFRONTATION

The first issue raised by the defendant on appeal involves evidence excluded by the trial court that, the defendant claims, tended to show that Rock was a participant, not a victim, in the crimes committed by the defendant. The defendant argues that by excluding this evidence and preventing the defendant from cross-examining Rock about it, the trial court violated his constitutional rights to present a defense and to confrontation. We agree. Further, we hold that the state has failed to prove that the proffered impeachment evidence of Rock, as it related to the kidnapping and burglary charges, was not harmless beyond a reasonable doubt. Therefore, we reverse the trial court's judgment of conviction on the charges of kidnapping in the second degree and burglary in the first degree and order a new trial on those counts alone.

The following additional facts and procedural history are relevant to this issue. In early October, 2006, Rock and the defendant had discussed leaving Meriden for South Carolina. At that time, Rock was a drug addict, and the defendant wanted to help her and get away from drugs. On October 6, 2006, the defendant and Rock got into an argument that devolved into a physical altercation, and after the defendant left to get some cigarettes, Rock attempted to commit suicide by overdosing on prescription medication. Rock testified that after the incident, she went back to the defendant's apartment to retrieve her personal effects and moved out.

At trial, the defense sought to portray Rock not as a victim, but as a participant in the crime. When police encountered Rock and the defendant at the Pulaski School, Rock told the officers that she had her father's blood on her hands. The defense also noted that, in her original statement to police, Linda placed Rock in the living room during the assault, and that the clothing that Rock was wearing that evening was consistent with the description that Linda gave of her attacker.[6] The defense also offered forensic evidence, showing that Rock had bloodstained hands, that a ring that she wore on her hand had Michael's blood embedded in it, and that she also had bloodstains on her clothing. Finally, the defense provided the testimony of a neighbor who did not think the defendant was using any force to get Rock to accompany him away from the apartment and also pointed to the description provided in the report of a police officer who observed the defendant and Rock walking "[h]olding hands."

The defense also sought to demonstrate that Rock had a motive to participate in these crimes. During an offer of proof outside the presence of the jury, Rock testified that, in the past, she and her stepfather, Michael, did not get along, but she maintained that their relationship had improved in the weeks before his murder. The defense claims that this testimony impeached Rock on her claim that she had been kidnapped by the defendant, because it suggested that Rock had a motive to participate in the attack and an incentive to leave with the defendant. The trial court excluded this evidence, finding that the prejudicial impact of Rock's testimony regarding her relationship with Michael outweighed its limited probative value. The court also found that, regarding the defendant's third party culpability argument, the evidence of Rock's poor relationship with Michael was insufficient to create a direct connection between Rock and the crimes for which the defendant was being prosecuted.

The defense later attempted to introduce evidence through the testimony of Sheila Pappas, a former friend of Rock. Pappas testified that she and another friend of Rock's, Aleta Marerro, went to Midstate Hospital in Meriden to visit Rock in the early morning hours of October 26, 2006. Pappas testified that Rock's hair, face, neck, and arms were stained with dried blood. Out of concern for Rock's health, Pappas took Rock into a hospital bathroom and used a washcloth to remove the blood from Rock's body. Pappas testified that she observed a scratch on one of Rock's hands, but could not identify a wound that could account for the amount of blood on Rock. Pappas testified that Rock was anxious to leave the hospital as soon as possible, and Rock, Marerro, and Pappas departed from Midstate Hospital at approximately 6 a.m. Later that day, Pappas accompanied Rock to the defendant's home, where Rock

retrieved four bags of clothing from a truck that Pappas believed was owned by the defendant. Pappas testified that Rock, along with Marerro and another friend, Gail Woodtke, then transported the clothing to Woodtke's home, where Marerro did some laundry. Rock showered and put on makeup, and then Pappas, Marerro, and Rock attempted to gain access to the Laverty home, where they were turned away by a police officer because the home was still an active crime scene. At no point on October 26, 2006, could Pappas recall Rock expressing concern for either Linda or Christopher. Finally, outside the presence of the jury, Pappas testified in an offer of proof for the defense that she had not spoken to Rock for approximately six months prior to the night of October 25, but that she knew that Rock and Michael had a terrible relationship, to the point that Michael would sleep in his car to avoid Rock. Pappas also testified in the offer of proof that Rock had told her that Michael had come into a sum of approximately $35,000, and that Rock and Linda wanted to obtain those funds. Pappas admitted that she had no firsthand knowledge of the status of Rock and Michael's relationship for the six months leading up to the murder, but she did maintain that within that time period Rock had expressed similar sentiments to another friend, Marerro, who then told Pappas. The trial court excluded Pappas' testimony on this subject, again concluding that, because Pappas had no firsthand knowledge of the status of Rock's relationship with Michael for the six months leading up to the murder, her testimony on the relationship was neither relevant nor credible.

The defendant claims that the trial court should not have prevented the defendant from cross-examining Rock in front of the jury about her relationship with Michael, and, further, the defendant claims that the trial court should not have excluded Pappas' testimony regarding both the poor relationship Rock had with Michael and Rock's purported desire to acquire the $35,000 that Michael had apparently recently obtained. Specifically, the defendant claims that the exclusion of this testimony violated his right to present a defense because his theory of the case was that Rock participated in the crimes for which he was convicted. The defendant also claims that the exclusion of Rock's testimony about her poor relationship with Michael violated his right to confrontation guaranteed by the sixth amendment to the United States constitution because her testimony impeached Rock's claim that the defendant kidnapped her and also suggested that Rock had an incentive to testify falsely in order to cover up her own alleged involvement in the events of October 25, 2006. We review the underlying evidentiary rulings of the trial court only for abuse of discretion; see, e.g., *State* v. *Devalda*, 306 Conn. 494, 516, 50 A.3d 882 (2012); and "[i]f . . . we conclude that the trial court properly excluded the proffered evidence, then the defendant's

constitutional claims necessarily fail." (Internal quotation marks omitted.) Id. We address each of the defendant's claimed constitutional violations in turn.

The defendant claims that the exclusion of the testimony from Rock and Pappas addressing Rock's relationship with Michael and of Rock's potential financial motive to kill him violated the defendant's constitutional rights to present a defense and to confrontation.[7] Specifically, the defendant claims that these rights were violated by the exclusion of Rock's and Pappas' testimony regarding the unhappy relationship between Rock and Michael, and also regarding Rock's statement to Pappas about Rock's desire to obtain the $35,000 that Michael had recently received.

"It is well established that [t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense." (Internal quotation marks omitted.) *State v. Hedge*, 297 Conn. 621, 634, 1 A.3d 1051 (2010).

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . .

"Impeachment of a witness for motive, bias and interest may also be accomplished by the introduction of extrinsic evidence. . . . The same rule that applies to the right to cross-examine applies with respect to extrinsic evidence to show motive, bias and interest; proof of the main facts is a matter of right, but the extent of the proof of details lies in the court's discretion. . . . The right of confrontation is preserved if defense counsel is permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . .

"Although it is within the trial court's discretion to determine the extent of cross-examination and the admissibility of evidence, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitu-

tional requirements [of the confrontation clause] of the sixth amendment. . . . Further, the exclusion of defense evidence may deprive the defendant of his constitutional right to present a defense. . . .

"[T]he confrontation clause does not [however] suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Rather, [a] defendant is . . . bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the [federal] constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . To the contrary, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Thus, [i]f the proffered evidence is not relevant [or constitutes inadmissible hearsay], the defendant's right to confrontation is not affected, and the evidence was properly excluded." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 8–10, 1 A.3d 76 (2010).

In analyzing the defendant's claims, we first examine the trial court's challenged evidentiary rulings. The defendant points to the exclusion of two pieces of testimony by two different witnesses regarding the same subject matter, namely, a potential motive for Rock to have participated in the violence against the rest of her family. The first challenged ruling involved Rock's testimony regarding her relationship with Michael during voir dire outside the presence of the jury.[8] The defendant argued that this testimony was relevant because it impeached Rock regarding her claim that the defendant kidnapped her and also suggested a potential motive for engaging in the crimes for which the defendant was charged. The court determined that this testimony was inadmissible, finding that the probative value of this statement did not outweigh its prejudicial impact. The trial court noted that "I am not saying that you are not allowed to attempt in the future to reintroduce that area, but . . . some of the things that you claimed on third party require the testimony of additional witnesses that I haven't heard from yet. You've represented what these things say, but they haven't been introduced in court. . . . I will permit you at a later time, if you want to recall the witness to discuss this, to do so . . . ." The other evidentiary ruling challenged by the defendant was the trial court's exclusion of that portion of Pappas' testimony dealing with Rock's relationship with Michael and a potential financial incentive for Rock to participate in the crimes of which the defendant was convicted.[9] The defendant argued that Pappas' testimony on this point was relevant to the defendant's third party culpability defense, as well as relevant to establishing that Rock had a

motive to harm Michael and suggesting that she was biased against him. The trial court refused to admit this testimony, stating that the defendant had not made a sufficient showing of third party culpability, that the probative value of Pappas' statements was limited because she admitted that she had not been friends with Rock for the six months prior to October 26, 2006, and that Pappas' testimony about Rock's potential financial motive to kill Michael was too vague.

The defendant relies primarily on our decision in *State* v. *Colton*, 227 Conn. 231, 630 A.2d 577 (1993), in support of his contention that it was reversible error to deny the defendant the opportunity to impeach Rock by attempting to show that Rock had a motive to murder Michael. In *Colton*, this court reversed the defendant's conviction because the defendant was prevented from cross-examining the only eyewitness or otherwise introducing evidence about (1) the eyewitness' history of drug use and prostitution, and (2) the fact that the eyewitness was receiving "reward money" from the state. Id., 249–52. Under the circumstances of that case, the eyewitness' credibility was extremely important. Id., 250. In *Colton*, no physical evidence tied the defendant to the crime and, as the only claimed eyewitness to the crime, this court determined that "[t]he motivation of [the eyewitness] in testifying was of paramount importance." Id. We concluded that "[i]n assessing [the eyewitness'] credibility, the jury had to inquire into the circumstances that led to her becoming a state's witness, the reasons for her long delay before coming forward and, most importantly, what role, if any, the reward money played in prompting her statements to the police a short while after the reward had been offered." Id. We later examined the effect that some of the excluded evidence might have had on the jury's evaluation of the eyewitness' credibility: "Had this evidence [of the eyewitness' continued drug abuse and prostitution to support her drug habit] been admitted, the jury might well have inferred that [the eyewitness'] testimony was motivated by an expensive drug habit, for which she prostituted herself to support, and that the existence of the reward presented her with a means of supporting that habit, thereby alleviating temporarily the necessity to engage in prostitution. Without this additional evidence, [the eyewitness'] insistent testimony that her old lifestyle had been left behind, after what appeared to be an exhaustive cross-examination, not only deprived the jury of exposure to facts from which it could assess the motivation of the witness in testifying, but also led to the appearance that defense counsel was engaged in a speculative and baseless line of attack on the motivation of an otherwise blameless witness." Id., 251.

In the present case, the defendant was given wide latitude by the trial court to cross-examine Rock. During her cross-examination, Rock admitted that she had

been in love with the defendant, and that they had spoken about leaving Meriden for South Carolina to get a fresh start. Rock admitted that during the relevant time period, she had been addicted to drugs and, as a result, her memory of everything that happened in that time period was unreliable. Rock also admitted that she was a compulsive liar. Although Rock was a key state's witness for the charges of kidnapping in the first degree, the defendant was acquitted on both of those counts, suggesting that the jury did not credit at least some of Rock's testimony.[10] However, because the defendant was convicted of kidnapping in the second degree, the testimony of Rock was an important factor regarding that charged offense. The fact that Rock had a stormy relationship with Michael and may have had a financial incentive to assist in the crimes should have been considered by the jury.[11]

We conclude that the trial court abused its discretion in excluding Rock's description of her relationship with Michael. Rock's testimony—that her relationship with Michael had been poor but was improving in the months leading up to his death—should have been presented to the jury because this testimony was relevant to establish Rock's potential motive for participating in these crimes along with the defendant.

With regard to Pappas' testimony, we conclude that the trial court abused its discretion in excluding her testimony regarding Rock's relationship with Michael and Rock's purported financial incentive to murder Michael. With regard to Pappas' testimony about Rock's relationship with Michael, Pappas admitted that she had not socialized with Rock in the six months leading up to the night of Michael's murder, and thus had no personal knowledge of the state of the relationship between Rock and Michael at the time the assault took place. This time gap, however, went to the weight rather than the admissibility of this impeachment evidence. With regard to the claimed financial incentive, Pappas could not provide a definitive amount that Rock believed she would receive if Michael died, nor could Pappas identify the source of the funds that Michael apparently obtained. However, the fact that Rock had discussed this potential financial incentive should have been presented to the jury.

The motivation of Rock in testifying was of paramount importance regarding both the kidnapping and burglary charges. In assessing her credibility, the jury was entitled to know about her past relationship with Michael and her potential financial incentive for planning his death. We have previously concluded that inquiry into the possible financial stake of a witness in the outcome of a case in which the witness is testifying is a proper subject of impeachment. Id., 250. Had the proffered testimony been admitted, the jury may have concluded that Rock was a participant in the crimes

and, therefore, it would have been impossible, pursuant to statute, for the defendant to have kidnapped her. Further, if Rock provided the defendant access to the Laverty's home, the jury may not have convicted him on the burglary charges.

We conclude, therefore, that the matters that the defendant sought to prove through the evidence he proffered at trial were clearly relevant to Rock's bias, interest and motive for testifying. The trial court's rulings precluded the defendant from offering a constitutionally sufficient minimum of evidence to impeach Rock's testimony.

We next consider whether the trial court's improper exclusion of evidence pertaining to Rock requires a new trial on the kidnapping and burglary charges. Although the outright denial of a defendant's opportunity to impeach a witness for motive, bias and interest implicates the constitutional protection of the confrontation clause, such a denial is subject to harmless error analysis. Id., 253. "A new trial is therefore required only if the exclusion of the proffered evidence is not harmless beyond a reasonable doubt." Id.

"Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) Id., 254.

If Rock's testimony had been impeached to the point that the jury believed that she was a participant, the kidnapping charge would have failed. Indeed, the jury acquitted the defendant on first degree kidnapping. Obviously, it did not entirely credit Rock's testimony. If the additional testimony had been admitted, the evidence may have had a tendency to influence the jury. Rock was a key witness regarding the kidnapping charge. The proffered testimony was not cumulative. Without her testimony the state had a weak case on the kidnapping charge. The exclusion of evidence bearing on the motivation of a chief witness is an important factor in any analysis of harmless error, particularly in the present case where no physical evidence corroborated the material aspects of Rock's testimony. The state has not demonstrated beyond a reasonable doubt that the exclusion of the proffered testimony constituted harmless error. Therefore, we reverse the defendant's conviction on the charge of kidnapping in the second degree and remand the case for a new trial on that count.

For a similar reason, we conclude that the inability of the jury to consider evidence of Rock's motive to

participate was harmful to the defendant's defense to the charges of burglary in the first degree. A person commits the crime of burglary, as that crime is defined pursuant to § 53a-101 (a) (2), when "such person enters or remains unlawfully in a building with intent to commit a crime therein and, in the course of committing the offense, intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone . . ." See also General Statutes § 53a-101 (a) (1) (indicating that person commits crime of burglary in first degree when "such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with . . . a deadly weapon or dangerous instrument"). "A person 'enters or remains unlawfully' . . . when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so." General Statutes § 53a-100 (b). Had the jury heard the excluded portions of Rock's and Pappas' testimony dealing with Rock's poor relationship with Michael and considered the rest of her described behavior that night in light of that testimony, it might have inferred that Rock had consented to the defendant's entry into the Laverty's home.[12] Consequently, we also reverse the defendant's convictions on the charges of burglary in the first degree and remand the case for a new trial on those counts.

With respect to the murder and assault charges, assuming, arguendo, without deciding that the exclusion of the evidence rose to the level of a constitutional violation, we conclude that the state has proven that the exclusion of the proffered evidence was harmless beyond a reasonable doubt.[13] As set forth previously in this opinion, Rock was not the key witness on the other charges. Linda and Christopher identified the defendant as the person who killed Michael and assaulted their family. One of the two knives that tested positive for Michael's blood fell out of the defendant's pocket. The other knife was dropped along the path that the defendant traveled after leaving the house. The defendant's DNA was discovered on the ski mask worn by the assailant. Further, the defendant conceded he was at the home on the night in question. Rock's testimony as to these offenses was cumulative to that of the other witnesses and there was also substantial corroborative physical evidence. Thus, the state's case was extremely strong regarding the other counts. We conclude, therefore, that the state has demonstrated beyond a reasonable doubt that the denial of the proffered impeachment evidence was harmless beyond a reasonable doubt as it related to the murder and assault charges.

## II

## JURY INSTRUCTION ISSUES

We turn to the defendant's claims related to the trial court's jury instructions, namely, that the trial court

should have: (1) instructed the jury on the defendant's defense of third party culpability; or (2) in the alternative, instructed the jury on the defendant's theory of the defense that Rock was at the very least a participant—if not the sole participant—in the crimes of which the defendant was convicted; and (3) instructed the jury on Rock's motive to testify falsely.

"We begin with the well established standard of review governing the defendant's challenge[s] to the trial court's jury instruction. Our review of the defendant's claim requires that we examine the [trial] court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n [impropriety] in instructions in a criminal case is reversible . . . when it is shown that it is reasonably possible for [improprieties] of constitutional dimension or reasonably probable for nonconstitutional [improprieties] that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 454–55, 10 A.3d 942 (2011).

A

Third Party Culpability Charge

The defendant claimed that he was entitled to a third party culpability instruction in light of (1) the forensic evidence, which demonstrated that Rock was present at the scene, and (2) the excluded testimony of Rock and Pappas. The defendant claims that a direct connection between Rock and the commission of the crimes of which he was convicted was established on the basis of this evidence.[14]

"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Inter-

nal quotation marks omitted.) *State* v. *Arroyo*, 284 Conn. 597, 607–608, 935 A.2d 975 (2007). "[T]he very standards governing the admissibility of third party culpability evidence also should serve as the standards governing a trial court's decision of whether to submit a requested third party culpability charge to the jury." Id., 608–609.

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated [that] [s]uch evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt. . . . Finally, [t]he trial court's ruling on the relevancy of third party inculpatory evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *State* v. *Hedge*, supra, 297 Conn. 635–36.

Whether a defendant has sufficiently established a direct connection between a third party and the crime with which the defendant has been charged is necessarily a fact intensive inquiry. In other cases, this court has found that proof of a third party's physical presence at a crime scene, combined with evidence indicating that the third party would have had the opportunity to commit the crime with which the defendant has been charged, can be a sufficiently direct connection for purposes of third party culpability. See, e.g., Id, 636–37. Similarly, this court has found the direct connection threshold satisfied for purposes of third party culpability when physical evidence links a third party to a crime scene and there is a lack of similar physical evidence linking the charged defendant to the scene. See, e.g., *State* v. *Cerreta*, 260 Conn. 251, 262–66, 796 A.2d 1176 (2002). Finally, this court has found that statements

by a victim that implicate the purported third party, combined with a lack of physical evidence linking the defendant to the crime with which he or she has been charged, can sufficiently establish a direct connection for third party culpability purposes. See, e.g., *State* v. *Arroyo*, supra, 284 Conn. 607–15.

In the present case, it is undisputed that Rock was physically present at the Laverty's home on the night that Michael was murdered and Christopher and Linda were assaulted, and it is also undisputed that Rock's clothing and one of her rings were stained with the blood of some of the other victims. There exists, however, a fatal flaw in the defendant's attempt to successfully raise the defense of third party culpability: the lack of a showing of sufficient evidence to provide a credible, alternative explanation for the substantial forensic evidence arrayed against the defendant. Although it remains true that, to be relevant to a defense of third party culpability, evidence need not exonerate the defendant, we have previously held that, in order for such evidence to be submitted to the jury for consideration, it must "provid[e] a credible, alternative theory as to who committed the crime . . . ." *State* v. *Hedge*, supra, 297 Conn. 647. The problem with the defendant's theory of his third party culpability defense—specifically, that Rock may not have been a victim, but a willing participant in the crimes—is that it does nothing to refute the defendant's own involvement.

The following facts reveal the defendant's involvement in the events of the night of October 25, 2006: (1) one of the two knives that tested positive for Michael's blood fell out of the defendant's pocket when he was subdued by police officers outside the Pulaski School; (2) the interior of the ski mask worn by the assailant tested positive for the defendant's DNA; (3) a shoe print in Michael's blood at the crime scene matched the shoe worn by the defendant; (4) two of the victims, Linda and Christopher, identified the defendant as their assailant and testified that they saw the defendant grasp Rock by her hair and force her out of the apartment; (5) various articles of clothing worn by the defendant, including his pants, shoes, and outer shirt, were stained with the blood of Michael, Linda, and Christopher; and (6) the defendant conceded that he was present at the Laverty's home during these events.

The evidence presented by both parties established that Rock was also in the home and that, at some point, she traveled through the living room and hallway where the assaults took place. Rock's hands were covered in blood, and a ring worn on one of her hands tested positive for Michael's blood. There was a slit in Rock's sweatshirt and tank top, and a small scratch on her stomach that had not existed prior to the night in question. Rock also stated that she was wearing sunglasses on top of her head during the assault. Once outside the

home, witnesses reported that the defendant did not appear to force Rock to accompany him, Rock told Christopher not to follow her, and Rock appeared fearful at the time the defendant was arrested. Rock also had bags of clothes stored in a truck at the defendant's house.

At trial, the defendant pointed to the bloodstains on Rock's hands and tried to suggest that Rock, and not the defendant, stabbed Michael, Linda, and Christopher. The defendant also points to the fact that Linda's original description of the attacker was consistent with the clothing worn by Rock on the night in question. Neither side presented any evidence, however, explaining how Rock's hands came to be bloody, and neither side presented any evidence indicating that Rock had access to the murder weapon that was discarded along the route.

Taking into consideration the excluded evidence of Rock's poor relationship with Michael and potential financial motive in having him killed, we must conclude that the defendant failed to present sufficient evidence to provide a credible, alternative explanation for the substantial forensic evidence arrayed against him. In addition, the defendant failed to establish a nexus between Rock and the weapons used to murder Michael and assault Christopher and Linda. For example, the defendant did not offer any evidence suggesting that Rock had access to or possession of the weapons used in this case, nor did he offer an explanation for the presence of his DNA on the inside of the ski mask or the presence of the blood of Michael, Linda, and Christopher on his various articles of clothing. As a result, we conclude that the trial court properly concluded that the defendant was not entitled to a jury instruction on third party culpability in the present case.

B

Theory of Defense Charge

The defendant claims, in the alternative, that this court should exercise its supervisory authority to create a rule requiring trial courts in Connecticut to give a "theory of defense" instruction to juries for any theory of defense with a foundation in the evidence presented at trial. A theory of defense instruction consists of an explanation of the defendant's theory of defense, and other courts have found that a defendant is entitled to such an instruction in a given case so long as "there is a foundation in the evidence . . . even if the trial court determines that the evidentiary foundation of the defense theory is only tenuous . . . ." (Citations omitted.) *United States* v. *Paul*, 110 F.3d 869, 871 (2d Cir. 1997). The defendant claims that, because his requested charge was not given as a theory of defense instruction, his defense was rendered meaningless as jurors were unable to consider the effect of Rock's possible participation on the charges against the defendant.

Courts in Connecticut generally do not provide a theory of defense instruction at the defendant's request, nor is there any requirement that such an instruction be provided. Instead, pursuant to *State* v. *Rosado*, 178 Conn. 704, 707, 425 A.2d 108 (1979), "[w]hen a defendant admits the commission of the crime charged but seeks to excuse or justify its commission so that legal responsibility for the act is avoided, a theory of defense charge is appropriate. A defendant must, however, assert a recognized legal defense before such a charge will become obligatory. A claim of innocence or a denial of participation in the crime charged is not a legally recognized defense and does not entitle a defendant to a theory of defense charge." In *Rosado*, this court was presented with the issue of whether it was improper for a trial court to refuse to instruct the jury "on any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . ." Id. We concluded that it was not, noting that such a conclusion was appropriate in Connecticut due to the fact that "[o]ur statutes expressly set out a number of affirmative defenses available to a criminal defendant . . . only when evidence indicating the availability of . . . [a] legally recognized [defense] is placed before a jury is a defendant entitled as a matter of law to a theory of defense instruction." (Citations omitted; emphasis omitted.) Id., 708. We have faithfully continued to follow *Rosado* even as other jurisdictions have adopted the broader approach suggested by the defendant—that the defendant be entitled to an instruction on his or her theory of defense, whatever it might be, so long as it has a foundation in the evidence. See, e.g., *State* v. *Golodner*, 305 Conn. 330, 352, 46 A.3d 71 (2012) ("When a defendant admits the commission of the crime charged but seeks to excuse or justify its commission so that legal responsibility for the act is avoided, a theory of defense charge is appropriate. . . . A claim of innocence or a denial of participation in the crime charged is not a legally recognized defense and does not entitle a defendant to a theory of defense charge." [Internal quotation marks omitted.]), quoting *State* v. *Rosado*, supra, 707; *State* v. *Rasmussen*, 225 Conn. 55, 88–89, 621 A.2d 728 (1993) ("When a defendant admits the commission of the crime charged but seeks to excuse or justify its commission so that legal responsibility for the act is avoided, a theory of defense charge is appropriate. A defendant must, however, assert a recognized legal defense before such a charge will become obligatory. A claim of innocence or a denial of participation in the crime charged is not a legally recognized defense and does not entitle a defendant to a theory of defense charge." [Internal quotation marks omitted.]), quoting *State* v. *Rosado*, supra, 707.

The defendant in this case acknowledges that, under our law developed pursuant to *Rosado*, his claimed theory of defense is not a "legally recognized" defense

on which a court would be required to instruct a jury. Instead, he invites us to overrule or modify *Rosado* in order to adopt the approach, taken by other jurisdictions, which would entitle a defendant to an instruction on his or her theory of defense regardless of whether it is legally recognized. To do otherwise, the defendant claims, would be to deprive the defendant of the opportunity to present a defense.

In the present case, the defendant's chosen theory of defense was that, although he conceded he was present at the scene of the crime, and although the physical evidence collected by law enforcement officials tied him to the stabbings of each of the victims, Rock may also have been a participant in these crimes and, thus, might have been responsible for all or some of the crimes for which the defendant was convicted. The trial court in this case included in its jury instructions a lucid and clear charge on the issue of identity: "The issue of identity is an issue in every criminal case. The state must prove beyond a reasonable doubt as to any charge that this defendant was the individual who committed each of the crimes that the jury considers. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you convict him. It is your duty to recall, and weigh, and consider all of the evidence relating to the identification of the defendant. You should consider the opportunity the witnesses had to observe the defendant, the degree of certainty of the identifications made by the witnesses, whether the witnesses knew the defendant before the identification, and any other circumstances that you think are relevant to the issue of identification." Later on, in describing the elements of each of the violent crimes for which the defendant was prosecuted, the court explained that, to find him guilty, the jury must have found that the defendant was the person who engaged in the behavior causing harm to each of the victims. For example, in explaining the elements of murder, the trial court explained that "[t]he second element the state must prove beyond a reasonable doubt in murder is, acting with [the intent to cause the death of Michael], [the defendant] did, in fact, cause the death of Michael . . . ." Thus, although the defendant did not succeed in having his proposed jury charge on his theory of defense included into the jury instructions,[15] the jury was instructed on the relevant legal concepts that the defendant sought to have included in the charge.

Courts in this state are already obligated to adequately instruct the jury on each essential element in a criminal offense. See, e.g., *State* v. *Anderson*, 212 Conn. 31, 37, 561 A.2d 897 (1989) ("the failure to instruct a jury on an essential element of a crime charged is error because it deprives the defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes

are" [internal quotation marks omitted]). We are satisfied that our law under *Rosado*, when combined with the requirement that trial courts must adequately instruct juries on each essential element of each crime for which the defendant is being prosecuted, adequately protects the defendant's right to present a defense. We therefore decline the defendant's invitation to use our supervisory powers to modify or overrule our holding in *Rosado*.

## C

### Motive to Testify Falsely

The defendant next claims that the trial court should have instructed the jury specifically regarding Rock's motive to testify falsely.[16] The defendant claims that the jury could infer from the evidence presented that Rock's potential participation in the crimes charged gave rise to a motive to testify in a way that would not expose her to criminal prosecution. The state argues that, because the trial court properly refused to give a third party culpability charge, a charge on Rock's motive to testify truthfully was inappropriate. The state also claims that the trial court's general charge on the credibility of witnesses sufficiently apprised the jury of the various factors it was to consider when evaluating Rock's testimony, particularly when combined with the defendant's extensive cross-examination of Rock. Relying primarily on *State* v. *Cooper*, 182 Conn. 207, 438 A.2d 418 (1980), and *State* v. *Ferrara*, 176 Conn. 508, 408 A.2d 265 (1979), the defendant argues that a specific instruction on Rock's motive to testify falsely should have been given to the jury because Rock was a complaining witness who could have been subjected to criminal prosecution based on evidence presented at trial if her claimed status as a victim of these crimes was disbelieved by law enforcement officials. We agree, and find this error harmful as to the defendant's convictions for burglary and kidnapping.

The trial court denied the defendant's request to give a specific instruction on Rock's credibility, but did provide a general instruction to the jury on the credibility of witnesses.[17]

"Generally, a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely." *State* v. *Ortiz*, 252 Conn. 533, 561, 747 A.2d 487 (2000); accord *State* v. *Colon*, 272 Conn. 106, 227, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). We have recognized two exceptions to this general rule, however: the complaining witness exception; and the accomplice exception. See, e.g., *State* v. *Ortiz*, supra, 561. Under the complaining witness exception, when "the complaining witness [himself] could . . . have been subject to prosecution depending only upon the veracity of his account

of [the] particular criminal transaction, the court should . . . [instruct] the jury in substantial compliance with the defendant's request to charge to determine the credibility of that witness in the light of any motive for testifying falsely and inculpating the accused." *State* v. *Cooper*, supra, 182 Conn. 211–12. "In order for [such a] request to be applicable to the issues in the case, there must be evidence . . . to support the defendant's assertion that the complaining witness was the culpable party. Id., 212." (Internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 467–68, 886 A.2d 777 (2005).

The defendant relies primarily on our decision in *Cooper*, a case in which this court held that the trial court committed harmless error when it refused to instruct the jury on the motive of the complaining witness in that case to testify falsely. *State* v. *Cooper*, supra, 182 Conn. 212–13. In *Cooper*, the defendant claimed that the trial court erred in refusing to instruct the jury that the complaining witness had a motive to testify falsely because, depending on whether his testimony was truthful or not, the complaining witness could have been subject to criminal prosecution himself. Id., 211–12. In that case, the defendant and two other men attempted to rob the complaining witness while he was sitting in his bedroom. Id., 208. In response, the complaining witness grabbed a shotgun that was within reach and wounded one of the other robbers. Id. In addition, years earlier, the complaining witness had been convicted of aggravated assault for shooting a man, which the complaining witness claimed had been out of self-defense. Id., 209. This court determined that the trial court erred in failing to give the requested instruction, because the complaining witness could have been subjected to criminal prosecution "depending only upon the veracity of his account of this particular criminal transaction." Id., 211–12. This court ultimately concluded, however, that the failure of the trial court to give the instruction was harmless because: (1) the trial court gave a general witness credibility instruction; id., 213–14; (2) the defendant was permitted wide latitude to cross-examine the complaining witness, and was permitted to "repeatedly [make the jury] aware of [the complaining witness'] motive for fabricating his account of the events at his apartment," including during closing argument; id.; and (3) the defendant's chosen defense was that of an alibi: he did not claim that he was present, "but that the complaining witness . . . was the person responsible for the altercation by his assault of the intruders." Id., 214–15.

In the present case, Rock's behavior could potentially have constituted a crime if her testimony were not believed. If the jury concluded that, contrary to her testimony, Rock assisted the defendant or otherwise participated in the events on the night in question, she could be subject to criminal prosecution. Importantly,

although the testimony of Christopher and Linda corroborated some of Rock's testimony, much of what the jury heard from Rock regarding her specific interactions with the defendant, both before the night of October 25, 2006, and after Rock and the defendant left the house, was not confirmed by any other testimony. If Rock's testimony were disbelieved, a reasonable inference might be drawn that she had been privy to the defendant's plan or assisted in its execution. For example, the defendant argued that there had been no unlawful entry into the Laverty's home, which would have negated one of the essential elements of the crime of burglary in the first degree and would also suggest that Rock was a participant in the crimes committed on the night of October 25, 2006.[18] As a result, we conclude that the trial court improperly refused to instruct the jury on Rock's motive to testify falsely.

We next examine whether this error was harmful. This requires us to determine "whether it is likely that the error involved affected the result and, as a consequence, rose to the level of depriving the defendant of a fair trial." Id., 212. As in *Cooper*, the defendant in the present case has not claimed that the trial court's failure to instruct the jury on Rock's motive to testify falsely violated any of his constitutional rights, so the defendant bears the burden of demonstrating that the court's error was harmful. See id. As we have previously explained in part I of this opinion, Rock's testimony and her credibility were critical to the defendant's convictions of kidnapping in the second degree and burglary in the first degree. We, conclude, therefore, that the trial court's failure to instruct the jury as to Rock's motive to testify falsely was harmful as to those specific counts.

The state argues that the trial court's general charge on the credibility of witnesses negated any error that the trial court may have committed in failing to specifically instruct the jury on Rock's motive to testify falsely and also claims that, to the extent that any error occurred, the error was harmless due to the defendant's extensive cross-examination of Rock. As we have already noted in part I of this opinion, although the court generally gave the defendant wide latitude to cross-examine Rock, it improperly failed to allow the defendant to impeach Rock with evidence suggesting motive or bias on the part of Rock against Michael. This error also distinguishes the present case from *Cooper* because, in the present case, the defendant was precluded from making the jury aware of Rock's potential motive to participate in or otherwise assist the defendant with the commission of these crimes, either through the presentation of evidence or during his closing argument.

Regarding the remaining offenses of which the defendant was convicted, we conclude, for the same reasons described previously in part I of this opinion, that, with

respect to these offenses, any error that may have occurred was harmless.

## III

## PROSECUTORIAL IMPROPRIETY

The defendant next argues that this court should use its supervisory powers to overturn the defendant's conviction because of the actions of one of the prosecutors throughout the trial, which the defendant characterizes as deliberate misuse of uncharged misconduct evidence, the purposeful misrepresentation by the prosecutor of facts not in evidence, and improper vouching by the prosecutor for Rock's credibility during his closing argument. The state argues that none of the prosecutor's actions was improper and, in the alternative, that none of the claimed improprieties denied the defendant his right to a fair trial. We conclude that a reversal of the defendant's conviction is not the appropriate remedy in the present case.

"Although prosecutorial [impropriety] is often examined under the rubric of a defendant's due process protections . . . our review in the present case is limited to whether reversal is required under our supervisory authority. As an appellate court, we possess an inherent supervisory authority over the administration of justice. . . . The standards that we set under this supervisory authority are not satisfied [merely] by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . Of course, our supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Thus, [e]ven a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions. . . .

"[W]hen prosecutorial [impropriety] is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper." (Citations omitted; internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 450–51, 797 A.2d 1088 (2002).

The defendant claims that the following actions by the prosecutor during the trial qualify as deliberate misconduct that warrants the use of our supervisory powers to reverse the defendant's conviction and order a new trial. The trial court permitted the state to introduce evidence of an episode of domestic violence between the defendant and Rock, but only for the limited purpose of proving the defendant's motive or intent to commit the crimes with which he was charged. On cross-examination, Rock was asked by defense counsel if "back-and-forth" physical altercations occurred fre-

quently between the defendant and Rock, and Rock answered affirmatively. On redirect, the prosecutor asked Rock if the defendant hit her frequently, whether she hit him frequently, and whether her physical violence against him would "have the same effect on him as it would you physically?" The prosecutor also asked Rock if the defendant had a temper, and whether she saw evidence of it. In addition, the prosecutor asked whether Rock varied her Oxycodone use depending on how bad her bruises were, and Rock answered in the affirmative, as she had on cross-examination. The prosecutor then pressed further, asking, "[w]hat did you mean by how bad the bruises were?" Defense counsel objected, noting that "[i]t's the same conversation we had at sidebar." The trial court sustained the objection. On recross, Rock answered affirmatively when defense counsel asked whether the defendant would obtain Rock's prescription medication for her and make sure that Rock took it, and generally that the defendant had been trying to help Rock. On further redirect, over defense counsel's objection, the prosecutor displayed to the jury a photograph of Rock following the domestic incident with the defendant that depicted her with a black eye and asked Rock: "Was he taking care of you when he did this to you . . . ?" During his closing argument, the prosecutor again referenced the defendant's domestic violence against Rock in discussing her credibility and whether she was kidnapped by the defendant, even though at least one witness testified that she resisted leaving the apartment with him: "Didn't she do the smart thing? She knew what he was capable of doing. You know what he was capable of doing, you have seen the pictures from the prior occasion." The defendant claims that the prosecutor also vouched for Rock's credibility during his closing argument by making the following statement: "You may not approve of [Rock's] lifestyle, the decisions she has made, her admissions of drug use in the past. And I submit that makes her an easy target. It doesn't mean that she is not telling the truth here two weeks ago."

Finally, the prosecutor told the jury that Linda had made two mistakes in her initial statement to police when, in fact, she had made a substantial number of changes to her statement and the prosecutor was aware of this.[19] Specifically, during closing, the prosecutor stated: "[T]he defense came up with and introduced two portions of [Linda's] statement that were inconsistent with what she had said at the time. . . . She admitted she made these mistakes, she corrected it. And given the fact that . . . she had just been released from the hospital, she was concerned about burying her husband, considering what she had gone through, she made two mistakes, which, actually, when you sit down and think about it, separate yourself for a minute, take those two mistakes and look at them, and say, did they really amount to a hill of beans? Did they change the facts

here? Does it [now make Rock] the stabber? I don't see it. I don't get it. Two mistakes out of that [twenty-five] page statement." Defense counsel then objected, claiming that the prosecutor had mischaracterized the evidence. The court instructed the jury that its recollection of the facts was to control, and the prosecutor again repeated: "Two mistakes out of that [twenty-five] page statement, is that a bad track record? Does that mean that there is reasonable doubt here?"

We disagree with the defendant's assertion that the prosecutor impermissibly vouched for Rock's credibility during closing argument. A prosecutor may not impermissibly vouch for a witness' credibility by expressing his or her own personal opinion as to the credibility of a particular witness. See, e.g., *State* v. *Payne*, supra, 260 Conn. 454. In the present case, however, the prosecutor merely urged the jury not to disbelieve Rock's testimony solely because of her lifestyle. Such a comment did not suggest that the prosecutor "may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions"; (internal quotation marks omitted) id.; which is the evil this rule is designed at preventing. A prosecutor is always free "to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom"; (internal quotation marks omitted) id.; which is what the prosecutor did here. Rock's lifestyle had been explored in great detail during both the state's direct and the defendant's cross-examination, and the prosecutor's statement merely suggested to the jury that her lifestyle choices did not necessitate an inference that she was not telling the truth about the events of the night of October 25, 2006. Such an argument, stemming from the evidence presented at trial, was not improper.

Finally, if we were to assume, arguendo, without deciding, that the prosecutor's remaining challanged statements constituted improprieties, however, we would need to consider additional factors in determining whether reversal of the defendant's conviction is an appropriate remedy, including the degree of prejudice to the defendant, the potential emotional trauma to the victims, and the availability of other sanctions for such misconduct. See Id., 463–65.

Weighing these factors, we conclude that even if we were to assume that the prosecutor engaged in impropriety in this case, such impropriety would not have significantly prejudiced the defendant. The state's case against the defendant was overwhelming. The defendant's clothing was covered in Michael and Linda's blood, the defendant was found carrying a knife stained with Michael's blood, the defendant's DNA was found on the interior of a ski mask, the exterior of which was stained with Michael's blood, and the statements and testimony of Christopher and Linda also linked the

defendant to each of the crimes of which he was convicted. Moreover, regarding the use of the evidence of domestic violence between the defendant and Rock, it is clear from the jury's verdict that it did not entirely believe Rock's testimony, as the defendant was acquitted of both counts of kidnapping in the first degree, and a guilty verdict for either of those counts would have required the jury to credit Rock's version of events. The circumstances in the present case thus differ greatly from the facts of *Payne*, in which we concluded that prosecutorial impropriety greatly prejudiced the defendant. See *State* v. *Payne*, supra, 260 Conn. 464 ("[T]he misconduct in the present case significantly prejudiced the defendant. Because of a lack of physical evidence, the state and the defense both depended heavily on eyewitness testimony, necessarily making the credibility of witnesses the crux of the jury's analysis."). Therefore, we cannot conclude that the alleged improprieties resulted in significant prejudice to the defendant. This consideration weighs against reversing the defendant's conviction. We need not consider the additional factors under *Payne* since they tend to weigh in favor of the state.

We conclude that the prosecutor's comments, even if we were to find them improper, which we do not, failed to result in significant prejudice to the defendant. Therefore, we affirm the defendant's convictions on the charges of murder and assault in the first degree.

The judgment is reversed only with respect to the charges of kidnapping in the second degree and burglary in the first degree, and the case is remanded for a new trial on those counts; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

[1] We note that although § 53a-54a was amended in 2012; see Public Acts 2012, No. 12-5, § 7; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] We note that the two counts of burglary in the first degree were merged into a single count at sentencing. We also note that § 53a-101 (a) was amended during a special session in January, 2008. See Public Acts, Spec. Sess., January, 2008, No. 08-1, § 2. That amendment, however, is not relevant to the present appeal. For the sake of simplicity, we refer to the current revision of the statute.

[3] The defendant brought his appeal to this court pursuant to General Statutes § 51-199 (b) (3).

[4] In her statement to police, Linda stated that the assailant wore a black, hooded sweatshirt with a face mask.

[5] At some point, either before the masked person walked up the stairs or as Rock and the masked person exited the apartment, Linda was also stabbed in the leg.

[6] Specifically, Linda testified that Rock was wearing a black, hooded sweatshirt, and Rock testified that during the evening she had been wearing sunglasses on top of her head to keep her hair off of her face.

[7] We note that the state claims that the statements of Rock and Pappas are relevant only to the defendant's claimed third party culpability defense. To the extent that the defendant sought to use this evidence to suggest that Rock, and not the defendant, was responsible for the crimes committed on the night in question, we agree with the state that such a use is properly evaluated pursuant to a framework of a defense of third party culpability. We address this issue in part II A of this opinion. We also note, however,

that the defendant's claimed relevance of this evidence for his defense was that "[h]ad the jurors learned about the evidence pertaining to [Rock's] motive, they could have determined that she was not a victim but rather someone who participated with [the] defendant and who planned to leave the state with him after the stabbing as she had testified about at trial." The defendant claims, and we agree, that he also sought to use this evidence to impeach Rock, an issue we explore in this part of the opinion. To fully address the arguments of both parties, we will examine whether the excluded testimony from Pappas and Rock was relevant to the defendant's defense *and* whether the excluded testimony was relevant for any other evidentiary purpose.

[8] The excluded portion of Rock's testimony is as follows: "We didn't get along very well. And it's weird because the last few weeks before he had died, we were actually starting to get along. He was going to therapy and he was taking medication for his moods, but before then, we didn't get along very well."

[9] The relevant portion of Pappas' excluded testimony regarding Rock's relationship with Michael is as follows: "[Rock] did not get along with [Michael]. . . . I have seen [Michael] sleeping in his car because he didn't want to be around her. . . . [The relationship between Rock and Michael] was on and off for as long as I have known [Rock]. . . . [Marrero] mentioned . . . [that Michael] wasn't happy that [Rock] was back in the house and they didn't get along. . . . I don't think that anything has changed since I was hanging around with her, as far as I heard."

The relevant portion of Pappas' excluded testimony regarding Rock's financial motive to participate in the crimes of which the defendant was convicted is as follows: "I'm not sure exactly what [the money which Michael came into] was, and I'm not sure of the amount. I just know that [Rock] talked about it a lot. . . . That he came into money. . . . [Rock] had stated to me a number of times, that she . . . and [Linda] would love it if he was out of the picture to get her hands on that money."

[10] Section 53a-92 (a) (2) (A) defines kidnapping in the first degree as when a person "abducts another person and . . . restrains the person abducted with intent to . . . inflict physical injury upon him [or her] or violate or abuse him [or her] sexually . . . ." Section 53a-92 (a) (2) (C) defines kidnapping in the first degree as when a person "abducts another person and . . . restrains the person abducted with intent to . . . terrorize him or a third person . . . ." Rock testified that while she and the defendant were seated in the abandoned car, the defendant told her that he had slit Michael's throat, stabbed Linda and Christopher, and that the defendant "told me that I had a lot of questions that were going to be answered and that he was going to inflict a lot of pain onto me." Apparently, the jury did not believe Rock's testimony because it acquitted the defendant of both counts of kidnapping in the first degree.

[11] Rock's credibility was critical to the charge of kidnapping in the second degree because she had testified that she left the house with the defendant because he had a knife and she believed that the defendant would have killed her if she resisted. The crime of kidnapping in the second degree is defined as when a person "abducts another person." General Statutes § 53a-94 (a). " 'Abduct' " is defined to mean "restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2). " 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein 'without consent' means, but is not limited to, (A) deception and (B) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement." General Statutes § 53a-91 (1). If the jury concluded that Rock had a motive to harm Michael or otherwise assist the defendant in the commission of the crimes of which he was convicted, the jury might have disbelieved Rock's testimony and instead inferred that she had consented to leave the premises with the defendant. If the jury were to make such an inference, the defendant could not have been found guilty of kidnapping in the second degree.

[12] The defendant was found in possession of a set of keys when he was arrested. Rock claimed that she had left a set of keys in the defendant's

apartment and, after the altercation on October 8, 2006, when Rock returned to the apartment to retrieve her belongings, the keys were no longer there. Rock claimed that she had barricaded the basement door with a bureau to prevent the defendant from using her keys to break in through the basement door, and police observed that the basement door was locked and barricaded the following day. The defendant argued that there was no unlawful entry into the basement, noting that the contents of it had not been disturbed. If the jury disbelieved Rock on this point, and concluded that the defendant had her permission to enter the Laverty home, even if they accepted that the door was barricaded, the jury could have inferred that Rock had notified the defendant of the fact that, as Christopher testified, the Lavertys placed the dryer venting system in the open and unlocked basement window when doing laundry. Police at the crime scene the next day found the window closed but unlocked. Thus, the jury was free to conclude that the defendant had entered the basement through the window that Christopher testified had been unlocked on the evening in question. Similarly, although we have noted that a burglary may be committed even after a lawful entry—such as when a defendant remains in a building after his license to enter is revoked; see, e.g., *State* v. *Belton*, 190 Conn. 496, 500, 461 A.2d 973 (1983); we cannot say beyond a reasonable doubt that the jury would have found that such consent, if given, was ever revoked if the jury inferred that Rock had assisted the defendant in his crimes.

[13] The defendant's specific theory of harm regarding these charges was that "because the state's theory was that [Rock] was a victim, it did not charge the defendant as an accessory . . . . Based on the [trial court's] instructions, the jurors were required to acquit [the] defendant of all of the charges if they believed that [Rock] was the stabber instead of the defendant."

[14] The charge requested by the defendant was as follows: "The defense offered evidence during this case to support its claim that [Rock] may have had some involvement in the commission of these crimes. If you credit that evidence, you may then use it to assess what role she may have played, if any, in the commission of some or all of the counts as charged. This type of evidence is sometimes referred to as 'third party guilt evidence.'

"When considering this evidence as offered by the defense, you must not consider whether the defense has established or proven that, in fact, [Rock] committed these offenses; rather, your only focus when considering this evidence is to determine whether it raises any reasonable doubt as to whether [the defendant] committed some or all of these offenses, and/or to what extent was his involvement.

"Again, it is the state's burden to prove the defendant's guilt beyond a reasonable doubt. The state must prove all of the elements of each count beyond any reasonable doubt, including the fact that it was the defendant who committed these crimes. This burden rests with the state at all times, and the defendant has absolutely no burden to establish who may have committed this offense."

[15] See footnote 14 of this opinion to review the defendant's requested "theory of defense" charge in full.

[16] The defendant's requested charge is as follows: "Further, when you consider the testimony of [Rock], if you believe that she may have played a role in this incident, you may then consider what motive, if any, she may have had to testify falsely in this case. If you find that [Rock] may have been subject to criminal prosecution, and that her initial version to the police and subsequent testimony here in court could have motivated her to inculpate the defendant, then you may consider that interest when you weigh her credibility. If, however, you believe that [Rock] was not involved as a participant in this incident, then you would not consider that factor."

[17] The charge read as follows: "In deciding what the facts are, you must consider all of the evidence. In doing this, you must decide what testimony to believe, what testimony not to believe; you can believe all of it, part of it, or none of it. In making that decision, you take into account a number of factors which include the following: Was the witness able to see, hear, or know about the things which the witness testified [to]? How well was the witness able to recall and describe those things? What was the [witness'] manner or demeanor while testifying? Did the witness have an interest in the outcome of the case or any bias or prejudice concerning any party or any matter involved in the case? How reasonable was the witness' testimony considered in light of all of the evidence in the case? Was the witness' testimony contradicted by what the witness had said or done at another time or by the testimony of other witnesses or other evidence?

"Evidence of a witness' substance abuse at or around the time of an incident can be used by jurors also to assess the credibility of the witness, particularly the person's ability to perceive, recall, and relate accurate information.

"Also, evidence of a witness' long-standing, serious, and persistent drug use is relevant, again, to gauge what that witness' general credibility and ability to perceive is.

"If you conclude a witness has deliberately testified falsely in some respect, you should carefully consider whether you should rely on any of that person's testimony.

"In deciding whether or not to believe a witness, keep in mind that people sometimes forget things. You need to consider, therefore, whether a contradiction is an innocent lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or with only a small detail.

"If you find that a witness has been inaccurate in one respect, remember it in judging that person's testimony and give it the weight you think it ought to have. You should size up the witness and make your own judgments as to their credibility and decide what portion, all, some, or none, of any particular witness' testimony you will believe. You should use all of your experiences, your knowledge of human nature, and of the emotions which influence and control human conduct, and you should test the evidence against that knowledge."

[18] See footnote 12 of this opinion. If the jury believed, contrary to Rock's testimony, that Rock had given the defendant consent to enter the home she could potentially be subject to criminal prosecution.

[19] Two portions of Linda's revised statement were admitted into evidence; the statement was never admitted in its entirety.

———————————————